In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2767

Ronnie B. Greer,

Plaintiff-Appellant,

v.

Debra H. Amesqua, Alan Seeger, Margaret
MacMurray, Byron Bishop, Lynn Hobbie, Mario
Mendoza, The City of Madison Fire Department,
The City of Madison, The City of Madison Police
& Fire Commission and Wisconsin Municipal
Mutual Insurance Company,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98 C 560--Barbara B. Crabb, Judge.

Argued January 21, 2000--Decided May 9, 2000

Before Bauer, Ripple and Kanne, Circuit Judges.

Kanne, Circuit Judge.  Plaintiff Ronnie Greer is
never shy about speaking his mind, and he doesn't
think highly of his former boss Debra Amesqua.
While he was a firefighter for the City of
Madison, Wisconsin, Greer publicly condemned
Amesqua's appointment as fire department chief
and attended her swearing-in ceremony carrying a
protest sign. Greer already had a long
disciplinary history with the fire department,
and when he distributed a "news release" to local
newspapers accusing Amesqua of favoritism to
homosexuals and of executing a radical lesbian
agenda as fire chief, the department terminated
his employment. Greer sued Amesqua, the fire
department and the City of Madison among others
for violating his due process, equal protection
and First Amendment rights in discharging him,
but the district court granted the defendants'
motion for summary judgment. Greer appeals, and
we affirm.

I.  History

 Ronnie Greer has compiled an eventful
disciplinary history with the City of Madison

Fire Department ("Department") since his hiring in 1981. During the 1980s, Greer was reprimanded for chronic tardiness and disciplined at least twice for insubordination after shouting matches with superior officers. Greer also quarreled with Chief Earle Roberts, Amesqua's predecessor, over two separate but related issues. Greer refused to submit to Department shaving inspections and filed a complaint with the Wisconsin Equal Rights Division ("ERD"). Around the same time, Greer told newspaper reporters that Chief Roberts and the mayor were deceiving the public by announcing that the hazardous materials protection team was ready for action. Greer told reporters that, contrary to the chief and mayor's claim, the team was unequipped, untrained and unprepared for emergency calls. The Department removed Greer from the hazardous materials team, and Greer sued the Department for employment retaliation in violation of his First Amendment rights. The Department and Greer agreed to settle both the ERD complaint and the federal lawsuit for $18,500.

In 1996, Greer received a letter of reprimand and was docked pay for being absent without leave or permission. The Department also began disciplinary proceedings against Greer for religious speech in the workplace but later dropped the investigation. Then, Greer had an argument with Assistant Chief Fred Kinney over Greer's misuse of sick pay and was suspended for three days. Greer appealed this suspension to the Board of Police and Fire Commissioners of the City of Madison ("PFC"), but the PFC affirmed the suspension. Finally, in late 1996, Greer disseminated a pamphlet entitled "Homosexuality: The Truth" to fellow firefighters in his station. The pamphlets referred to homosexuality as a "filthy scourge" and blamed gays for disease and child molestation. On November 27, 1996, Amesqua suspended Greer for three months without pay and wrote Greer that "your disciplinary record is extremely poor. The sanction I am imposing is a last-ditch attempt to get you to alter your ways. You should fully appreciate that any further breaches of our standards could well result in your termination." On June 25, 1997, after Greer appealed, the PFC noted Greer's "uniquely abysmal and disheartening" disciplinary record, found that Greer's pamphleteering constituted workplace harassment and upheld Greer's suspension. The PFC commented that Greer's record reflected his "persistent incapacity to conform himself consistently to the appropriate requirements of ordinary civil conduct" and warned that it was "not overly confident that this discipline will accomplish a change in [Greer's] pattern of conduct. However, [the PFC is] confident that [it] will not suspend him again."

Greer bitterly objected to Amesqua's appointment. Greer believed that Amesqua was unqualified for the job and that the Department had hired her over more qualified candidates. Amesqua is a Native American woman who Greer believed to be homosexual, and Greer credited her appointment to affirmative action rather than to her substantive qualifications. Greer opposed affirmative action in the Department, and on several occasions, Greer complained personally to the mayor of Madison about hiring discrimination and Amesqua. At the press conference announcing Amesqua's hiring, Greer told reporters that Amesqua was unqualified and the Department might have engaged in "something that was illegal" in hiring her and "purposely overlook[ing] other qualified candidates." Greer also attended Amesqua's swearing-in ceremony as the lone vocal dissenter, bearing a large placard declaring "Injustice is just wrong. Not affirmative action" on its face and "When does wrong become right?" on its back. Greer admits that he has been publicly critical of Amesqua more than fifty times since her appointment.

Greer also believed that Amesqua lacked character and leadership ability because she is a lesbian. Indeed, Greer could be fairly characterized as an anti-homosexuality crusader. As pastor for the thirty-member Trinity Evangelical Church, Greer inveighed against the sins and evils of homosexuality. One newspaper article profiling Greer described him as a "Madison firefighter whose personal mission is to wipe homosexuality from our midst" and explained that Greer has been "called a hate-monger and a malcontent unable to obey authority" by some and "a person of integrity who put his own job on the line to fight for civil rights" by others. Greer deemed homosexuality to be "a perversion, and usually sexual perversion is related to someone's character." He compared it to "pedophilia or some guy sleep[ing] around with different women when he's married, it's a character issue." He questioned whether homosexuals should be permitted to hold positions of authority because he considered homosexuality to be "destructive to the individual and as well as society."

All this came to a head in late 1996, less than a year after Amesqua's appointment. On November 5, 1996, a local television station aired video of Division Chief Marcia Holtz making physical contact and screaming at recruit Ron Cato during a training session. Six days later, the firefighters' union formally requested that Holtz be suspended and reprimanded for the incident with Cato ("Holtz-Cato incident"), and Amesqua assigned Assistant Chief Bill Spohn to

investigate the charge. On April 9, 1997, amid local media scrutiny, Amesqua announced that Spohn's investigation found Holtz's conduct was "not unreasonable under the totality of the circumstances," but extended Holtz's probation for six months and ordered her to attend a leadership class.

 Since Holtz is a lesbian, Greer predictably was appalled by Amesqua's decision and suspected favoritism. On April 28, 1997, Greer faxed the following self-styled "news release" to a number of local media outlets, including both major Madison newspapers:


News Release
Homosexual Chief rewards Homosexual
Chief for Assault?

Fire Chief Debra Amesqua has issued a decision on the investigation of an incident involving Training Chief Marcia Holtz and a fired firefighter trainee. In the incident, recorded by WMTV News-15 in October 1996, Chief Holtz shoved and screamed at the trainee during a training exercise. An investigation was ordered and a decision based on the investigation was issued on April 9, 1997. It is Chief Amesqua's conclusion that the "questionable measures" (shoving & screaming) used by chief Holtz were not "unreasonable", and that she simply "needs further guidance and training". That training is to be accomplished by "attending an advance leadership class", a training program which is coveted by other chief officers to the extent that there is a "waiting list" to get in! She has also called for a 6 month extension of chief Holtz's probationary period, something she (Chief Holtz) herself appears to have suggested.

Now this would be laughable it were not such a serious matter. A senior officer in essence, physically and verbally assaults an employee and Chief Amesqua finds that "not unreasonable" and that her screaming was "professional in content and germane". In over 17 years of firefighting with both experienced and non-experienced firefighters, I don't believe I've ever seen a situation where it was necessary to physically assault anyone to get their attention or to instruct them. Granted it is often necessary to make physical contact in a fire situation to initiate communication with another firefighter, but never to the extent as we have seen in this incident. So what's so special or different about this case?

I said in October that this matter would be "down played", "swept over" and nothing significant

would be done about it. A lot of my fellow firefighters doubted my "prediction". Well, time has "told the story". One does not need to be a prophet, just someone willing to see things as they are.

Consider the following. One would think that if you wanted to achieve clear facts in investigating a matter of this type it would be only proper to have that investigation done by an independent, disinterested party. However, that is not the case here. The investigation was done by another Division Chief who is a subordinate to Chief Amesqua and a staff member with Division Chief Holtz. Is it possible that the investigating officer could have been unduly influenced? Or could the conclusions of the investigation be simply disregarded without opposition by that subordinate?

The relationship between Chief Amesqua and Chief Holtz goes back a ways, namely through their affiliation with an organization called "Women In Fire", an organization seen by most firefighters in this area as a predominantly homosexual organization. Is it possible that some favoritism has been shown here to a fellow member or possible friend? Both are homosexual women, who have been seen in the past (and still now among many), with clear agendas as it concerns women in the fire service. Could it be that their radical agendas has come to play to the extent that even violence can be excused and "glossed over", or in this case, rewarded? Sounds a lot like the much assailed "good-ol-boy" system revived, repainted and given another name.

Now, I'm confused and maybe someone could make sense of this for me; It's not okay to communicate verbally my views on a department chief officer's handling an issue but it's okay to use physical force to communicate with a trainee? Maybe I'm missing something! The department/city is willing to spend thousands of dollars on a case of an alleged comment without proof, on alleged harassment without a complaint or proof, and on an alleged rule violation without action or proof, but "winks" at and rewards physical assault?

Another firefighter is given a disciplinary letter and has the same placed in his employment file because he made a remark regarding homosexuals. He was "off-duty" and happened to stop by the fire station. A letter of discipline?

A fire officer is facing a 12 hour suspension for angrily making comments to a uniform delivery driver whom he is familiar with. A 12 hour suspension?

But yet, it's not unreasonable for a chief officer in anger to physically handle an employee? Imagine if it were a white male chief officer shoving and screaming at a female recruit. Heads would have rolled! So much for fair treatment and equity! Go figure.

Oh, by the way, that male trainee who was the victim, he was mysteriously "let-go" literally days before graduating from the fire academy. Makes you go, "Hmm."

The Capital Times, a Madison newspaper, received Greer's facsimile and printed the following article on the front page of the Local/State section in its May 1, 1997 edition:

Greer says fire chief plays gay games

Madison firefighter Ron Greer has lobbed another Molotov cocktail at his boss, this time accusing Fire Chief Debra Amesqua of meting out lax discipline to a female assistant fire chief.

He also insinuates that it's a lesbian conspiracy.

In a press release titled "Homosexual chief rewards homosexual chief for assault?" Greer implies that Amesqua showed favoritism in an investigation of Assistant Chief Marcia Holtz.

Holtz was accused of using excessive force on a recruit during a live fire training exercise last October.

Neither Amesqua nor Holtz has said anything publicly about their sexual orientations, whether they're gay or straight.

* * *

Greer, a pastor of a conservative Christian church, has become an anti-gay crusader. He has attacked the chief publicly ever since she came to Madison in January 1996.

Saying Amesqua was unqualified, Greer carried a protest sign when she was sworn in.

Greer himself is facing discipline for insubordination and for handing out anti-gay literature at work. The Madison Police and Fire Commission held roughly 20 hours of hearings on Greer's case and is expected to rule in a few months.

* * *

According to his press release, he concluded that the two women are homosexual apparently because they both belong to a group "Women in Fire," an erroneous reference to the Madison-based group Women in the Fire Service.

The organization "is seen by most firefighters in this area as a predominantly homosexual organization," Greer's press release said.

"Could it be that their radical agenda has come to play to the extent that even violence can be excused and 'glossed over,' or in this case, rewarded?" the release said.

Amesqua directed Assistant Chief Carl Saxe to investigate Greer's news release. Greer confessed to Saxe that he had written and faxed the news release to the local media. Greer admitted that his knowledge about the Holtz-Cato incident derived completely from television reports and workplace gossip, but insisted that his news release "was only asking questions," not making accusatory insinuations. On June 5, 1997, Saxe filed his report with Amesqua and recommended that Greer be discharged based on his insubordination, continuing campaign to derogate the Department, disregard for Department rules and "unequivocal assertion of his continued right to do what he did." Saxe felt that Greer's news release charged that Amesqua was "not fit to be Chief because [she] violate[s] the law in [her] official capacity. If ever [Saxe had] seen conduct that brings the Department in disrepute, this is it." Saxe found that Greer's news release had violated Department Rules 18, 39, 51, 65 and Administrative Procedure Memorandum 3-5 ("APM 3-5"), prohibiting insubordination, harassment and bringing the Department into disrepute./1 However, Saxe found that Greer had not violated Department Rule 47, requiring employees to tell the truth, or Department Rule 50, barring false reporting and gossip, because Greer sincerely believed that the substance of his news release was true.

In a letter dated June 10, 1997, Amesqua adopted Saxe's findings and notified Greer that she would recommend to the PFC that, especially in light of his disciplinary history, he be terminated because his news release violated the aforementioned Department rules. She explained that Greer's news release was "equivalent to spitting in the Department's face" and his "continuing presence on the worksite can no longer be tolerated considering the open, notorious and personal way in which [he] attempt[s] to address [his] personal agenda." Amesqua filed formal charges with the PFC for disciplinary proceedings and recommended Greer's

termination.

During an eight-day hearing, beginning on September 29, 1997, and ending March 19, 1998, Greer was represented by counsel, submitted evidence in his defense and had the opportunity to cross-examine witnesses against him, including Amesqua and Saxe. Amesqua explained during cross-examination that Greer was discharged because of his flagrant insubordination against her and Department leadership in publicizing his unsupported suspicions to newspapers. In deciding to terminate Greer, Amesqua considered the news release, Saxe's report, Greer's personnel file, Greer's disciplinary record and the disciplinary records of other Department personnel. She observed that "[t]here is no one that has a work history or disciplinary history as bad as Ron Greer's." She also denied that she had ever publicly declared herself homosexual and reported that she had received numerous complaints from the public and firefighters about Greer, although she could not remember how many of these complaints related to the news release. Greer moved to introduce evidence contesting elements of his disciplinary record and moved for the recusal of several commissioners, pointing to a potential conflict of interest stemming from their involvement in an unrelated discrimination suit to which Greer was not a party nor otherwise involved. The PFC denied both of Greer's motions. On July 31, 1998, the PFC found just cause for termination under Department rules, Wisconsin law and federal law.

On August 5, 1998, Greer sued Amesqua, the individual commissioners of the PFC, the City of Madison, the Department and the City's insurer in district court under 42 U.S.C. sec. 1983 seeking damages and reinstatement for violation of his First Amendment, due process and equal protection rights. Greer waived his rights under Wisconsin law to appeal the PFC ruling to Wisconsin state court, see Wis. Stat. sec. 62.13(5)(I), and both Greer and the defendants filed cross-motions for summary judgment. On June 21, 1999, the district court granted summary judgment for the defendants on all three of Greer's claims, and Greer now appeals.

II.  Analysis

The district court granted summary judgment for the defendants on all three of Greer's claims: (1) denial of procedural due process under the Fourteenth Amendment; (2) denial of equal protection under the Fourteenth Amendment; (3) employment termination in violation of the First Amendment. We review a grant of summary judgment de novo. See Weicherding v. Riegel, 160 F.3d

1139, 1142 (7th Cir. 1998). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.  Due Process

The parties agree that Greer had a protected property interest in his continued employment with the Department, but Greer claims that the Department terminated his employment without granting him procedural due process under the Fourteenth Amendment because (1) his pretermination hearing was constitutionally inadequate; (2) three of five PFC commissioners were biased against him; and (3) the Department rules under which he was prosecuted did not give him prior notice of proscribed conduct.

1.  Pretermination Hearing

Due process requires that the government employer provide a pretermination hearing in which the employee receives notice of the reasons for the prospective termination and has the opportunity to respond to the charges. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). The hearing need not constitute a full evidentiary hearing that definitively resolves the propriety of the discharge, so long as it serves as "an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46.

During his eight-day hearing before the PFC, Greer was represented by counsel and had the opportunity to hear the charges against him, present evidence in his defense and confront witnesses testifying against him. His hearing satisfied the basic requirements of procedural due process under Loudermill, and requiring more before termination in this context "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546. The fact that Greer did not have the opportunity to contest whether his

previous disciplinary reprimands were justified does not detract from the adequacy of Greer's PFC hearing. Unlike the petitioners in Kaczmarczyk v. INS, 933 F.2d 588, 596 (7th Cir. 1991), who lacked the opportunity to rebut officially noticed facts before the Board of Immigration Appeals, Greer had ample previous opportunity to rebut the factual findings underlying the past charges against him when those disciplinary actions were prosecuted. Greer concedes that he received due process in connection with those past offenses, and due process does not require that the Department permit Greer to re-argue the merits of his previous offenses each subsequent time that he is charged with violating Department rules. The employee is entitled only to notice and a legitimate opportunity to respond before an unbiased adjudicator. See Schacht v. Wisconsin Dep't of Corrections, 175 F.3d 497, 503 (7th Cir. 1999).

In addition, Greer complains that the PFC excluded testimonial evidence which he claims would prove that his charges against Amesqua were true. Essentially, Greer insists that the PFC pretermination hearing was insufficient because he was barred from presenting all the evidence that he felt was relevant, as he might at a trial. However, as we have discussed, a pretermination hearing need not be a "full evidentiary hearing" to satisfy due process concerns. See Loudermill, 470 U.S. at 545; Staples v. City of Milwaukee, 142 F.3d 383, 387 (7th Cir. 1998). With respect to a First Amendment retaliation claim, the relevant inquiry is whether the employer had reasonable grounds to believe that the employee had violated its rules and that its interests as an employer outweighed the employee's free speech interests. See Waters v. Churchill, 511 U.S. 661, 676 (1994). The PFC needed only to ascertain a reasonable basis for finding whether Greer had violated Department rules, and "[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." Id. at 678. The PFC hearing was quite sufficient under this standard, and Greer enjoyed adequate opportunity to respond to the charges against him.

2. Conflicts of Interest

At his PFC hearing, Greer moved for the recusal of Commissioners Alan Seeger, Margaret MacMurray and Byron Bishop, citing alleged conflicts of interest from their participation in hiring Amesqua and consequent involvement in a discrimination suit filed against them by an unsuccessful applicant for Amesqua's position. Greer claimed that the named commissioners possessed "a clear personal, official, and

potential financial interest" in upholding Amesqua's decision to terminate Greer. A showing that administrative adjudicators were biased would establish a failing of procedural due process, but mere participation in earlier decisions that relate only tangentially to the current adjudication does not constitute an impermissible conflict of interest, unless the employee can produce evidence that bias in fact infected resolution of his case. See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 493 (1976). Greer must overcome a strong presumption of "honesty and integrity" in assessing whether the adjudicators were impartial. See Withrow v. Larkin, 421 U.S. 35, 47 (1975); Vukadinovich v. Board of Sch. Trustees of Mich. City Area Schs., 978 F.2d 403, 411-12 (7th Cir. 1992).

Greer failed to adduce any evidence of personal bias or animosity against him on the part of Seeger, MacMurray or Bishop, and it is difficult even to identify the conflict of interest that Greer suspects here. Greer's case had no bearing on the discrimination suit brought against the Department and the commissioners because that suit did not involve Greer in any way or touch upon any of the same underlying factual circumstances. Greer guesses that adjudging against him would permit the commissioners to present a united front with Amesqua and would therefore bolster their credibility in the discrimination suit. We are not sure why Greer thinks this to be the case, but without any substantiating evidence of bias, this confused possibility does not constitute an impermissible conflict of interest.

3. Void for Vagueness

Greer also argues that the Department rules under which he was terminated violated his due process rights because they were void for vagueness and failed to give him adequate prior notice of workplace rules./2 Although a government regulation is void for vagueness if people of common intelligence must necessarily guess at its meaning and differ as to its application, see Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972), the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees. For example, a government employer "may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." Waters, 511 U.S. at 673; see also Arnett v. Kennedy, 416 U.S. 134, 158-62 (1974). The Department need not have adopted "a quasi-criminal code" in establishing

employment regulations. See Keen v. Penson, 970 F.2d 252, 259 (7th Cir. 1992); see also Brown v. City of Trenton, 867 F.2d 318, 325 (6th Cir. 1989). Department rules gave fair warning to employees in instructing them to "conduct themselves so as not to bring the Department into disrepute" (Rule 51); "treat their superiors with respect [and] conform to the rules and regulations of the Department" (Rule 18); "conform to and promptly and cheerfully obey all laws, ordinances, rules, regulations, and orders" (Rule 39); "not [to] harass co-employees because of their sexual orientation" (Rule 65); and not to "engage in harassment on the basis of race, sex, religion, color, age, disability, national origin or sexual orientation." (APM 3-5). Although written in general language, these rules in the employment setting sufficiently define a range of inappropriate conduct which a reasonable employee would understand to satisfy due process and convey adequate warning that Greer's news release would result in discipline.

 Greer points to purportedly uneven punishment under Department rules as sapping them of fair notice of prohibited conduct. Even ignoring the fact that most of the cited instances of unpunished insubordination occurred under the previous Chief Earle Roberts, none of the other Department critics made comparably instigative accusations or possessed comparably poor disciplinary records. Greer's strongest example illustrates this point: The Capital Times reported in 1992 that firefighter Art Cuccia called Chief Roberts a "spineless, gutless, self-centered S.O.B." The Department punished Cuccia with a letter of discipline but added no further penalties. When asked about the disparity between the punishments received by Cuccia and Greer, Amesqua answered that Cuccia had a spotless disciplinary record before the incident and evinced genuine contrition by affirming his "utmost respect" for Roberts and explaining that his comment was a misquotation of a response to a journalist's question. In contrast, Greer had widely distributed an inflammatory news release criticizing the Department, possessed an opprobrious disciplinary record and had been disciplined under Department rules many times before. Amesqua had cautioned him that future misconduct would lead to a more serious penalty, and the PFC had specifically warned him that it "will not suspend him again." Blame for any failure to foresee severe punishment for his news release fell on Greer alone.

B.  Equal Protection

 To state a prima facie claim under the Equal Protection Clause of the Fourteenth Amendment, a

plaintiff must demonstrate that (1) he is otherwise similarly situated to members of the unprotected class; (2) he was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent. See Johnson v. City of Fort Wayne, 91 F.3d 922, 944-45 (7th Cir. 1996). Greer complains that the Department violated the Equal Protection Clause by treating him, as a male heterosexual, differently from female homosexual employees who likewise have criticized the Department--namely Holtz and Amesqua.

Where an employee has an "undisputed record of gross insubordination," as Greer does, the employee must show that another grossly insubordinate worker was treated better than him to defeat the presumption that his comparatively harsher punishment was attributable to his poor disciplinary history. See O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1371 (7th Cir. 1993). Greer claims that Holtz and Amesqua publicly criticized the Department and were not terminated, but neither had comparably dismal disciplinary records nor made comparably vituperative attacks. According to Department records, Greer had the worst disciplinary record in recent memory, and his public diatribe was an incendiary attack on the Department defying repeated warnings and sanctions in the past. Greer has failed to show himself to be similarly situated with Amesqua, Holtz and other members of the unprotected class treated better than him.

Moreover, Greer presents no evidence of prejudice against him. Greer invites an inference of bias based on the disparate treatment given to his news release compared with Department criticism by Holtz, Amesqua and another female firefighter that went unpunished. Similarly in Vukadinovich, the plaintiff argued that his employer had violated the Equal Protection Clause because he was "singled out" from his co-workers and punished for his alcohol-related problems while his similarly situated co-workers were not. We refused to engage in a review of all the employer's personnel decisions absent some evidence of "purposeful or invidious prejudice" by the employer. See Vukadinovich, 978 F.2d at 414. Greer fails to produce such evidence of prejudice underlying the allegedly disparate treatment that he received, and his equal protection claim likewise fails.

C.  First Amendment Retaliation

Lastly, Greer claims that the Department violated his First Amendment rights under the balancing test of Pickering v. Board of Education of Township High School District, 391 U.S. 563

(1968), by terminating him based on his news release. While it is undisputed that the Department fired Greer because of his news release, the Department violated Greer's rights under the First Amendment only if Greer can establish that (1) his speech addressed a matter of public concern and (2) his First Amendment interest in that speech outweighed any injury that the speech might cause to the government's interest in promoting the efficiency of the public services it performs through its employees. See Waters, 511 U.S. at 668; Pickering, 391 U.S. at 568. The PFC ruled that Greer's speech addressed a matter of public concern but decided that the Department's interests as an employer outweighed Greer's First Amendment interests. Without deciding whether Greer's speech addressed a matter of public concern, the district court agreed that the Department's interests outweighed Greer's First Amendment interests and affirmed the PFC's decision to discharge Greer. We now address this question de novo. See Wright v. Illinois Dep't of Children & Fam. Servs., 40 F.3d 1492, 1499-1500 (7th Cir. 1994). Under Pickering balancing, we assess Greer's speech as the Department reasonably believed it to be, after adequate investigation, when making the decision to terminate Greer. See Waters, 511 U.S. at 676.

 As the PFC correctly ruled, Greer's speech regarded a matter of public concern. Looking to "the content, form, and context" of Greer's news release, Connick v. Myers, 461 U.S. 138, 147-48 (1983), we agree that the news release primarily addressed the issue of favoritism within the Department and the lenient disciplinary action taken against Marcia Holtz. Whether public officials are operating the government ethically and legally is a quintessential issue of public concern. See Lickiss v. Drexler, 141 F.3d 1220, 1222 (7th Cir. 1998); Knapp v. Whitaker, 757 F.2d 827, 840 (7th Cir. 1985); see also Walter v. Morton, 33 F.3d 1240, 1243 (10th Cir. 1994). Although Greer's news release was replete with personal jibes at Amesqua and Greer nursed an ongoing disrespect for Amesqua, "[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern." See Marshall v. Porter County Plan Comm'n, 32 F.3d 1215, 1219 (7th Cir. 1994). Greer's central motivation was exposing what he considered wrongdoing by declaring that the Department's handling of the Holtz-Cato incident reflected illegitimate favoritism by Amesqua for lesbian firefighters. His criticisms of the Department went far beyond complaints regarding his individual employment situation and were not motivated primarily by purely personal grievances. See, e.g., Kokkinis v. Ivkovich, 185

F.3d 840, 844 (7th Cir. 1999); Smith v. Fruin, 28 F.3d 646, 653 (7th Cir. 1994); Swank v. Smart, 898 F.2d 1247, 1251 (7th Cir. 1990).

However, the second prong of the Pickering test instructs that we also must balance "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." See Pickering, 391 U.S. at 567-68. Factors to consider in applying Pickering balancing include (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. See Kokkinis, 185 F.3d at 845; Wright, 40 F.3d at 1502.

Although it is often proper for public employees to raise questions about favoritism or improper investigation of disciplinary incidents, the manner and means of the employee's protestation are key considerations in balancing the employer's and employee's interests under Pickering. See Wright, 40 F.3d at 1503; Hulbert v. Wilhelm, 120 F.3d 648, 654 (7th Cir. 1997); Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1259 (7th Cir. 1985). Greer never approached Amesqua or Holtz regarding the Holtz-Cato incident, and did not pursue internal avenues for questioning the Department's investigation. Instead, unwilling to let the firefighters' union address the matter and ignorant of specifics about Spohn's investigation, Greer fired off his news release to local media, causing considerable public embarrassment to the Department. Without inside knowledge about the Holtz-Cato incident or the ensuing investigation, Greer speculated that Amesqua and Spohn "glossed over" workplace violence because Amesqua was illegitimately biased in favor of homosexuals. The publicity and sensationalism of Greer's news release belied the fact that it imparted little new information about the Holtz-Cato incident to the public discourse other than Greer's unsubstantiated suspicions. Greer's posture under Pickering would be stronger if he "had followed authorized procedures, appealed to more appropriate authorities, or perhaps shown a wilful lack of

investigation on the part of [his] superiors." Wright, 40 F.3d at 1504; see also Hulbert, 120 F.3d at 654. Despite his claim that he was innocently "just asking questions," Greer instead circulated his naked accusations to mass media outlets for broad public consumption and intended to indict the integrity of the Department's leadership publicly.

Moreover, the Department's interests in disciplining Greer and maintaining order were quite substantial. In a fax distributed to the major newspapers in Madison, Greer had publicly excoriated Amesqua as a lesbian harboring "radical agendas" and announced both Amesqua and Holtz to be "homosexual women" despite the fact that neither had publicly declared their sexual orientation (Greer protests irrelevantly that both had not concealed their homosexuality at work). His harangue led directly to the publication of a front-page newspaper story headlined, "Greer says fire chief plays gay games." Furthermore, Greer had a well-established history of publicly criticizing the Department over policy disagreements. Greer had just been suspended three months for distributing anti-homosexuality literature at work, and the PFC had warned him to cease his campaign against Amesqua. As a firefighter known within the community as an outspoken Department critic, Greer likely anticipated and intended the damaging effect of his news release. The Department reasonably felt that Greer's speech, if left unpunished, particularly in light of his disciplinary history, would disrupt the operation of the Department by degrading the Department's standing with the public, undermining Amesqua's authority and inciting disharmony within Department ranks. See Campbell v. Towse, 99 F.3d 820, 830 (7th Cir. 1996); Marshall, 32 F.3d at 1221; Brown, 867 F.2d at 322. As Amesqua declared in her charge letter, Greer's news release was "the equivalent to spitting in the Department's face." Analyzing analogous factual circumstances in Kokkinis, we held that Pickering balancing favored the government when a police officer with a poor disciplinary record leveled sensationalistic charges of impropriety at the police chief during a television news interview. Kokkinis, 185 F.3d at 846. Likewise, the Department's interests as an employer in government efficiency and workplace morale outweigh Greer's First Amendment interests here.

Although Greer protests that his news release did not ignite actual disruption in his workplace, an employer need not establish actual disruption before disciplining an employee when the threat of future disruption is obvious. See Waters, 511 U.S. 673. After learning of Greer's

news release, Amesqua promptly disciplined Greer to reestablish her authority and stave off workplace dissension potentially flowing from Greer's conduct. Greer's news release threatened to undercut Amesqua's authority and disrupt the Department, just as the police officer's accusations in Kokkinis potentially "undermined the Chief's ability to maintain authority and discipline within the police department." Kokkinis, 185 F.3d at 846 (quoting Khuans v. School Dist. 110, 123 F.3d 1010, 1017 (7th Cir. 1997)). A government employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," Connick, 461 U.S. at 152, and we grant "substantial weight to government employers' reasonable predictions of disruption." Waters, 511 U.S. at 673; see also Weicherding, 160 F.3d at 1143 (explaining that the defendant "need not wait until a riot breaks out before acting to quell a dangerous situation"); Breuer v. Hart, 909 F.2d 1035, 1040 (7th Cir. 1990) ("The public employer is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration."). The potential disruption that Greer's news release could have caused to the Department's operations if Greer had not been terminated is clear.

Greer expostulates at length that the "veracity" and "sincerity" of his statements bear critical weight, but truth is not an absolute defense under Pickering balancing. Indeed, the Department dropped its charges under Rules 47 and 50 because Saxe concluded that Greer believed the truth of his charges and did not violate the rules requiring honesty and prohibiting false reporting; the PFC instead found that Greer had violated Department rules against insubordination, harassment and bringing the Department into disrepute. Nonetheless, Greer claims his allegation that Amesqua had illegally favored Holtz was true, or at worst a sincerely held belief, and thus carried decisive weight under Pickering.

Recklessly false statements by a public employee enjoy no First Amendment protection, see Brenner v. Brown, 36 F.3d 18, 20 (7th Cir. 1994), and from this principle Greer wrongly extrapolates that speech which is factually true therefore must be absolutely protected. However, we have never held that an employer must prove the falsehood of the employee's statement before disciplining the employee based on that speech. In fact, Pickering would be senseless if speech sincerely believed to be true was absolutely protected. Pickering balancing only applies to

speech that is true or believed to be true, because recklessly false speech is unprotected by the First Amendment. In Wright, which Greer cites for support, we noted that a public employee "summoned to give sworn testimony . . . has a compelling interest in testifying truthfully and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases." Wright, 40 F.3d at 1505. The point is that an employee has an enhanced interest in telling the truth when sworn to do so before "an official government adjudicatory or fact-finding body," and his employer's interest is unlikely to counterprevail. Id. Greer's news release did not constitute adjudicatory testimony under penalty of perjury and enjoys no special protection under Wright. Like the PFC, we have assumed that Greer's news release was not recklessly false and nonetheless hold that the Department was justified in terminating him under Pickering.

III.  Conclusion

 For the foregoing reasons, we AFFIRM summary judgment for the defendants on all Greer's claims.


/1 Rule 18:  Members shall be efficient and capable in the service and must not neglect their duty. They shall hold themselves in readiness, at all times, to answer the calls and obey the orders of their superior officers. They shall treat their superiors with respect. . . . They shall conform to the rules and regulations of the Department, observe the laws and ordinances, and render their services to the city with zeal, courage and discretion and fidelity.

 Rule 39:  Members must conform to and promptly and cheerfully obey all laws, ordinances, rules, regulations, and orders, whether general, special or verbal, when emanating from due authority.

 Rule 51:  Officers and members shall at all times conduct themselves so as not to bring the Department in disrepute.

 Rule 65:  Employees shall not harass co-employees because of their sexual orientation either by the use of derogatory verbal or written comments, graphic materials, gestures or conduct

. . . .

 APM 3-5:  Any employee who shall engage in harassment on the basis of race, sex, religion, color, age, disability, national origin or sexual

orientation . . . is guilty of misconduct and shall be subject to remedial action, which may include the imposition of discipline up to and including discharge.

/2 Greer also argued on appeal that the rules were unconstitutionally overbroad, but that claim is waived because he failed to raise that claim before the district court. See United States v. Payne, 102 F.3d 289, 293 (7th Cir. 1996).