In the

# United States Court of Appeals
## for the Seventh Circuit

No. 22-2137

RICHARD S. SCHNEITER,

*Plaintiff-Appellant,*

*v.*

KEVIN CARR, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 21-cv-135 — **James D. Peterson**, *Chief Judge.*

ARGUED FEBRUARY 23, 2023 — DECIDED JULY 31, 2025

Before SYKES, *Chief Judge*, and ROVNER and LEE, *Circuit Judges*.

SYKES, *Chief Judge*. Richard Schneiter worked for the Wisconsin Department of Corrections for more than 40 years, rising through the ranks to become deputy warden of the state's minimum-security facilities. His tenure reached an unexpected end when the *Milwaukee Journal Sentinel* reported that he had posted offensive internet memes on his Facebook page. The posts denigrated Muslims, blacks,

liberals, and the LGBTQ community, and one referred to the Confederate flag as "our flag."

Department officials commenced an investigation and eventually fired Schneiter, explaining that his offensive Facebook posts created security concerns, diminished public trust in the Department, and cast doubt on his ability to perform the duties of his leadership position respectfully and without bias. Schneiter sued the Secretary of Corrections and other officials alleging that he was fired in retaliation for his online speech and without due process in violation of his rights under the First and Fourteenth Amendments. The district judge entered summary judgment for the defend-ants, ruling that the Department's interests as a public employer outweighed Schneiter's speech interests under the balancing test established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). On the due-process claim, the judge held that the Department provided adequate notice and an opportunity to be heard before proceeding with the termination.

We affirm. Our cases recognize that law-enforcement and corrections agencies need substantial latitude to determine whether an employee's speech undermines the effective operation of governmental functions. *See, e.g.*, *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013). That principle weighs heavily here. The Department's interests as a public employer—namely, its duty to maintain security and disci-pline in state correctional facilities—outweighs Schneiter's interest in posting this material on Facebook. The due-process claim is likewise meritless. Schneiter complains that the Department did not give its employees notice that their social-media posts might jeopardize their jobs. But public

employers are not constitutionally required to adopt specific policies about social-media use before they may discipline employees for social-media activities that may interfere with their job duties. And Schneiter otherwise received sufficient notice and an opportunity to be heard before he was fired.

## I. Background

Schneiter's lengthy tenure with Wisconsin's Department of Corrections began in 1977 when he was hired as an entry-level correctional officer. He gradually moved up the career ladder and in 2011 was promoted to the significant leadership position of deputy warden for the Wisconsin Correctional Center System. Situated within the Department's Division of Adult Institutions, the Correctional Center System encompasses a network of 14 minimum-security prisons scattered throughout Wisconsin. Schneiter's responsibilities included monitoring operations at the facilities; hiring, training, and supervising employees; settling grievances; ensuring policy compliance; and serving as a liaison for the system. About 20% of his duties involved communicating with inmates and 10% involved interacting with community members and government bodies; the rest of his time was spent on his managerial responsibilities as the head of the system.

As Schneiter's long list of management duties suggests, the Department classifies a deputy warden as a high-level official. Throughout this 40-year tenure with the Department, he was never disciplined for his performance. Quite the opposite: he was consistently recognized as a stellar employee.

Over the course of several weeks in June 2019, Schneiter posted on his Facebook page five internet memes touching on issues of race, religion, and gay rights in particularly inflammatory and degrading ways. We don't need to get bogged down in the parties' varied interpretations of the memes; it's enough to say that they mocked, belittled, and promoted dehumanizing assumptions about black people, Muslims, and gay people.

Before turning to the details, we pause to note that Schneiter—or possibly his son—deleted the posts from his Facebook page sometime after they attracted public scrutiny. Since then, no one involved in this case has successfully accessed the posts in their original form, so the record contains only partial screenshots. As Schneiter recalls the posts, the screenshots omit crucial details. Some screenshots, for example, cut off the lower portion of the posts, so we can't tell whether Schneiter or any of his Facebook friends left comments and, if so, what was said. The cropped screen-shots similarly hide whether anyone "reacted" to the posts—i.e., responded with an icon. And one post lacks a date and time stamp. Finally, it's not entirely clear if Schneiter created any of the memes himself or if all were initially posted by others and "shared" by Schneiter. With these qualifiers in mind, we turn to the memes.

The first one was posted on June 7. Schneiter did not cre-ate this meme himself; he instead "shared" a meme initially published by an account entitled "Keep America Great." Here is a screenshot:



The next meme was posted on June 21, two weeks later. The "pause" and "volume" symbols in the lower corners suggest that this one may have been posted as a video rather than as a still image:



On June 22 Schneiter posted two memes. Here is the first:



An account called "Rowdy Conservatives" initially posted the next meme, and Schneiter shared it to his Facebook page minutes later:



The final meme was presumably posted sometime in June, though it lacks a date stamp. It's a photo of a Muslim woman and child wearing black burqas standing next to two full black garbage bags. The text accompanying the photo compared the Muslim child to garbage. Unlike the others, the screenshot of this meme includes comments showing that two people posted emojis "reacting" to it—one with a "thumbs up" and the other with a "sad face."



One additional datapoint about Schneiter's social-media posts: his Facebook page had been set as "private." In other words, he had blocked the general public from accessing his page, allowing only those designated as his Facebook "friends" to view his posts. That's not to say that his online audience was small; he had approximately 1,200 Facebook friends, including many employees of the Department of Corrections.

Sometime soon after Schneiter posted the last of these memes, an anonymous tipster leaked them to the *Milwaukee Journal Sentinel*. On July 16 a *Journal Sentinel* reporter called and emailed Schneiter asking about his reasons for posting the memes and whether they represented his personal views. Responding early the next morning, Schneiter sent the reporter the following message from his government email address: "I repost different things on Facebook that are certainly not always my opinion but show the different opinions of others to bring awareness to issues." Schneiter also talked with the reporter on the phone later that day. After the interview, Schneiter immediately alerted his

supervisor that the *Journal Sentinel* planned to publish a story about the posts that day.

And so it did. On July 17, 2019, the *Journal Sentinel* published an article with the headline: "Deputy Prison Warden Posts Facebook Meme that Compares Muslim Children to Garbage." The article explained Schneiter's background, described the five controversial memes, and included screenshots of some of them. The reporter included several quotes from Schneiter, who explained that his posts were being misinterpreted and that he only wanted to engage in discussions on controversial issues.

The article also included a response from a Department of Corrections spokeswoman who said that agency officials were unaware of Schneiter's Facebook posts and would investigate. She also said the Department was committed to maintaining an "environment free of discrimination, harassment, and retaliation." Finally, the article included a Twitter post from the Lieutenant Governor responding to the controversy; he criticized the posts as bigoted and stated in part that Schneiter "ha[d] to be taken out."

On July 17 Makda Fessahaye, the Administrator of the Division of Adult Institutions, placed Schneiter on paid administrative leave and initiated an investigation. In the meantime, the Department received emails from three community members, each expressing disgust with Schneiter's posts; two specifically requested that he be fired.

Fessahaye assigned investigators Tory Enger and Christine Preston to look into the matter, and they interviewed Schneiter a week after the article was published. During the interview, Schneiter admitted to posting the memes but

claimed that he did so only "to get a conversation started." He also acknowledged that standing alone, the memes "could be construed as discriminatory."

About a week later, Schneiter emailed Enger and Preston asking them to interview several current and former Department employees who were his Facebook "friends." The investigators interviewed two from Schneiter's list: Chris Buesgen and Wes Ray. Ray acknowledged that he was Schneiter's Facebook friend but said he was not familiar with the posts. Buesgen explained that Schneiter was an avid Facebook user who posted primarily about politics. Buesgen didn't find the posts offensive, but he agreed that they could "open[] doors to controversies." The investigators also interviewed Quala Champagne, Schneiter's supervisor, and Stephanie Hove, the Assistant Administrator of the Division of Adult Institutions. Champagne and Hove worried that Schneiter's conduct would have a negative effect on the Department and undermine its institutional values.

Enger and Preston submitted a written summary of their investigation on August 9. In brief, they concluded that Schneiter had violated three work rules. First, his unauthorized email exchange and phone interview with the *Journal Sentinal* reporter violated the Department's policy concerning unapproved media interviews; that, in turn, violated Rule 2, which requires employees to "comply with written agency policies and procedures." Second, by posting the memes to his Facebook page, Schneiter violated Rule 14, which in relevant part prohibits "[i]ntimidating, … harassing, demeaning, treating discourteously, or bullying" others, or using "abusive language in dealing with others." Third, the Facebook posts violated Rule 25, which bars employees

from engaging in "outside activities" that "may impair the employee's independence of judgment or … ability to perform his/her duties as an employee of the state."

An "Infraction Review Team" reviewed the report and agreed with the investigators' conclusions. Fessahaye was a member of this review team in her capacity as Administrator of the Division of Adult Institutions.

The next step was a "predisciplinary" meeting, which Schneiter attended with his personal representative. After presenting their findings, Enger and Preston invited Schneiter to offer any mitigating information. Reading from a prepared statement, Schneiter discussed his professional accomplishments and contextualized the posts. He claimed that he had attached a comment to the meme of the Muslim woman and child that he contended "clearly indicated" his disagreement with the "nature of th[e] meme," though he had no evidence to substantiate this claim because he had deleted the post. Schneiter explained that he posted the flag meme shortly after Wisconsin's governor decided to fly the LGBTQ flag at the state capitol. He said he feared that other organizations may "push to have their flag[s] displayed." The remaining memes, he asserted, were not at all inappropriate; he said each one "provided a message" that he felt "needed to be expressed." His personal representative echoed that position, saying that Schneiter was simply "[s]tarting a conversation about difficult topics that we face today in society."

A "Disciplinary Action Review Team," which again included Fessahaye, then reviewed the matter and determined an appropriate disciplinary response. The team recommended that the Department terminate Schneiter's employment.

A "Management Advisory Team" of upper-level managers—including Kari Beier, the Director of the Bureau of Personnel and Human Resources—reviewed and approved the termination recommendation.

In early November Beier presented the recommendation to Kevin Carr and Amy Pechacek, the Department Secretary and Deputy Secretary at the time. They agreed that Schneiter's posts had damaged the Department's credibility, undermined its mission, and exacerbated safety concerns in the corrections facilities. They approved the recommendation to fire him, and Pechacek signed a disciplinary routing slip confirming that the Secretary's Office had approved the decision to skip the usual disciplinary track and proceed directly to termination. That decision required review by the Division of Personnel Management, which promptly approved it.

On November 8, 2019, Pechacek sent Schneiter a letter informing him of the termination decision. In addition to the specific rules violations we've already discussed, the letter identified several general reasons for the decision to fire him. We mention the main ones: (1) Schneiter's postings impaired his ability to perform his duties as a deputy warden, in part because he had "referenced the Confederate flag as 'our' flag"; (2) he had denigrated "minorities, Muslims and the LGBTQ community," casting public doubt on his ability to lead and to treat others "fairly and impartially"; (3) the posts harmed the Department's "strong working relationships within a diverse workforce" and risked interference with recruitment; (4) Schneiter's expressions of "animus" created safety concerns in correctional facilities; and (5) given his high-level position, Schneiter's postings

drew a greater degree of negative attention to the Department. The disciplinary reviewers did not accept Schneiter's claim that he posted the memes only "to spark conversation" and "bring attention" to controversial topics; he provided no evidence to support that assertion.

Schneiter sought reinstatement through the administrative grievance procedures available under Wisconsin law. When those remedies proved unsuccessful, he filed an administrative appeal with the Wisconsin Employment Relations Commission alleging that the Department had fired him without just cause. A hearing examiner upheld the Department's decision, the Commission issued a formal order to that effect, and Schneiter unsuccessfully sought judicial review in state court.

While pursuing his state remedies, Schneiter also filed this federal suit under 42 U.S.C. § 1983 alleging that he was fired in violation of his First Amendment right to freedom of speech and his Fourteenth Amendment right to due process.[1] Seeking damages, declaratory relief, and injunctive relief (including reinstatement), the complaint named four high-level Department officials as defendants: Secretary Carr, Deputy Secretary Pechacek, Makda Fessahaye (the Administrator of the Division of Adult Institutions), and Kari Beier (the Director of the Bureau of Personnel and Human Resources).

The defendants moved for summary judgment on all claims, and the district judge granted the motion across the

---

[1] Schneiter also brought a claim for violation of his right to freedom of speech under the Wisconsin Constitution. He abandoned that claim on appeal.

board. On the First Amendment claim, the judge applied the *Pickering* balancing test and concluded that the Department's interests as a public employer outweighed Schneiter's speech interest in posting the memes to his social-media page. Schneiter's due-process claim rested largely on his argument that the Department could not discipline him in the absence of a specific policy about employee social-media use. The judge rejected that theory and concluded that Schneiter had received constitutionally adequate notice and an opportunity to be heard before he was fired.

## II. Discussion

We review the summary-judgment order de novo, construing the evidence in the light most favorable to Schneiter as the nonmoving party and drawing all reasonable inferences in his favor. *Munson v. Newbold*, 46 F.4th 678, 681 (7th Cir. 2022). We begin by addressing which forms of relief are still at issue on appeal. As we've noted, Schneiter initially sought declaratory and injunctive relief in addition to damages. At oral argument his attorney withdrew the requests for declaratory and injunctive relief, emphasizing that the case had been narrowed to a request for damages.[2]

---

[2] Before oral argument we worried about a potential clash between the state and federal litigation and raised a concern about abstention; we asked counsel to be prepared to address that question. With Schneiter's concessions at oral argument, abstention is no longer a concern. In state court Schneiter pursued state administrative remedies and sought reinstatement. With the narrowing of the federal litigation to the two federal constitutional claims and a request for damages as the sole remedy, there is no conflict or duplication.

With only monetary relief now in play, the doctrine of qualified immunity rises to the surface. Qualified immunity shields public officials from civil damages liability, protecting "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted). The qualified-immunity inquiry has two steps: We ask first whether the defendants "violated a federal statutory or constitutional right" and second whether "the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Both conditions must be satisfied to pierce the immunity and subject a government official to damages liability.

The defendants preserved the qualified-immunity defense, but the district judge did not specifically address it. That was understandable. Schneiter initially sought equitable relief in addition to damages, so the judge zeroed in on the merits of the constitutional claims and found for the defendants across the board. That made the second step in the qualified-immunity framework unnecessary. Because we agree that Schneiter's constitutional claims fail on the merits, there's no need to say anything more about qualified immunity.

## A. Free-Speech Retaliation Claim

To prevail on a First Amendment retaliation claim, a public-employee plaintiff must prove that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his "protected speech was a motivating factor in the deprivation." *Harnishfeger v. United States*, 943 F.3d 1105, 1112 (7th Cir. 2019). The

second and third elements are not at issue here. It's undisputed that Schneiter was fired for his Facebook posts; the loss of his job is a substantial deprivation and causation is conceded. The free-speech claim thus turns on the threshold inquiry, which asks whether Schneiter's First Amendment rights are implicated at all.

The Supreme Court's jurisprudence on the First Amendment rights of public employees has long rejected the idea that simply "answering the call to public service" strips a citizen of his free-speech rights. *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022). After all, "a citizen who works for the government is nonetheless a citizen." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Still, the Court has recognized the fundamental difference between the government's general role as a regulator and its role as an employer. Accordingly, free-speech doctrine gives the government a freer hand in regulating the speech of its employees. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418. Accordingly, the Court has held that the Constitution tolerates greater restrictions on public-employee speech, but it does so only to the extent "necessary for [public] employers to operate efficiently and effectively." *Id.* at 419.

Emerging from these competing aims is a two-step inquiry for evaluating whether a public employee's speech is constitutionally protected. At the first step, the employee must establish that he "spoke as a citizen on a matter of public concern." *Id.* at 418. "If a public employee speaks pursuant to [his or her] official duties," then the First

Amendment offers no protection because "that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (alteration in original) (internal quotation marks omitted). Schneiter's Facebook posts were not the Department's speech; that much is undisputed. The district judge therefore passed over this point and assumed that the posts qualify as citizen speech on a matter of public concern. Everyone accepts that determination for purposes of appeal, and we agree.

Where, as here, the public employee spoke as a citizen on a matter of public concern, then his speech falls within a zone of possible constitutional protection. At that point the doctrinal inquiry requires "a delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547 U.S. at 423.

This balancing test originates from the Supreme Court's decision in *Pickering*. There the Court explained that the goal of the employee-speech doctrine is to weigh "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. "Because of the enormous variety of fact situations in which" employee speech risks harm to a public employer, the Court has declined "to lay down a general standard against which" employee speech "may be judged." *Id.* at 569.

Our cases applying *Pickering* have articulated a nonexclusive list of seven factors that may be relevant to the balance of interests:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Harnishfeger*, 943 F.3d at 1115 (quoting *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016)).

As we've noted, however, it's not necessary to consider each of these factors in every case, and "merely counting how many factors line up on each side is not particularly informative." *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025) (quotation marks omitted). Because *Pickering* calls for a context-sensitive inquiry, our seven-factor list is neither a doctrinal touchstone nor a straightjacket. *Id.* Rather, it is sometimes "more meaningful to focus on the specific considerations that bear weight in evaluating the competing interests" in the case at hand. *Id.*

We take that approach here, starting with the interests on Schneiter's side of the scale. He posted the memes on his personal Facebook page during nonwork hours, and neither his Facebook profile nor the posts specifically identified his public employment. Moreover, although the posts were not "private" in the conventional sense—they were shared with

about 1,200 people—it remains true that only those whom Schneiter had included in his group of Facebook "friends" could view them. So the speech at issue in this case was essentially personal and not on its face linked to Schneiter's state corrections job.

Schneiter has repeatedly denied that he posted the memes with any "offensive or discriminatory intent." By his account, his aims were to criticize political parties for "taking voters for granted"; to "show how Facebook inconsistently removes posts"; to "draw attention" to the risks of flying select flags; and to confront those who arbitrarily "level charges of racism." Expressing no view on these claims, we nonetheless acknowledge their connection to contested political and cultural issues.

We turn, then, to the Department's countervailing interests. They are significant. Our circuit's *Pickering* caselaw gives special solicitude to public employers in the law-enforcement and correctional contexts because "safety and order" are of "paramount concern[]." *Volkman*, 736 F.3d at 1092. Recognizing the limits of our own institutional competence, we generally defer to the judgments of law-enforcement and correctional officials regarding "the disruptive nature of an employee's speech." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015). Put more explicitly, law-enforcement and correctional agencies have "more latitude" in their personnel and disciplinary decisions than "ordinary government employer[s]." *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999) (quotation marks omitted). The correctional context looms large in this case.

Though Schneiter disclaimed any discriminatory intent, he conceded in his opening brief that "some of the memes

are offensive." No doubt. Among other things, the memes compared Muslim children to garbage, suggested that all Muslims should leave the United States, referred to the Democratic party as a "plantation," and aligned with white supremacists against the LGBTQ community. Public employers, like their private counterparts, have a significant interest in ensuring respectful, nondiscriminatory workplaces.

More directly to the point here, the Department is a large state corrections agency that houses a diverse population and has a diverse workforce. As a deputy warden, Schneiter was responsible for managing a division of 14 correctional facilities. Targeting Muslims, black, and gay people, Schneiter's posts denigrated populations he was required to supervise, manage, and lead. The Department reasonably concluded that Schneiter's posts risked exacerbating already high tensions among the inmates and causing "increased distrust, unrest, or even violence" in its correctional facilities. After all, the Department's core obligation is to maintain order and security in its correctional facilities.

The Department was also quite reasonably concerned that the posts called into question Schneiter's ability to treat staff fairly and impartially. And that, in turn, could undermine the Department's efforts to maintain harmonious workplace relationships, comply with nondiscrimination requirements and norms, and successfully recruit new staff.

Resisting this conclusion, Schneiter emphasizes that there is no evidence that his posts caused any disruption. But "a showing of actual disrupti[on] is not required"; a public employer may act based on "potential disruption" so long as its predictions are reasonable. *Lalowski*, 789 F.3d at 791

(quotation marks omitted). And by placing Schneiter on administrative leave soon after discovering the Facebook posts, the Department may have prevented a disruptive reaction in its correctional facilities. *See Weicherding v. Riegel*, 160 F.3d 1139, 1143 (7th Cir. 1998) (observing that the expeditious suspension of an employee likely avoided racially motivated disruption).

The Department also has a significant interest in maintaining public confidence in its services. A public employer's reputational interests are a valid part of the balancing inquiry. *See, e.g.*, *Lalowski*, 789 F.3d at 792 (noting that a police officer "compromised the community's trust in its police officers"); *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1221–22 (11th Cir. 2001) (deeming the maintenance of public confidence "a compelling and legitimate government interest").

Perhaps the weightiest consideration here is the degree of deference owed to the Department's own assessment of the risks to its mission-critical correctional operations. Schneiter was not just a rank-and-file correctional officer. He held a high-level office as a deputy warden—a leadership role of significant trust and confidence, with operational and managerial responsibility over inmates and staff in 14 correctional facilities. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick v. Myers*, 461 U.S. 138, 151-52 (1983). And as we've noted, the law-enforcement context is *especially* deserving of deference. Much more than other public employers, law-enforcement agencies depend on "order, discipline, and esprit de corps" for their effective functioning. *Kokkinis*, 185 F.3d at 845. In these sorts of "paramilitary" environments—"where safety

and order are paramount concerns"—we give considerable deference to the agency's own assessment of the risks to security and discipline. *Volkman*, 736 F.3d at 1092. Under these circumstances, the Department's interests in maintaining order, safety, and discipline in its correctional facilities outweigh Schneiter's interest in posting these memes on social media.

**B.  Due-Process Claim**

Schneiter's due-process challenge centers on his complaint that the Department lacked a specific policy about social-media use by employees. He does not call into question anything about the termination process itself: he has not challenged the adequacy of the notice, hearing, and layers of administrative review he received. Instead, he focuses on the *content* of the Department's work rules. His argument, while not entirely clear, primarily concerns the *substance* of the Department's work rules, not the *process* that preceded the termination of his employment. Though not clearly labeled as such, his argument resembles a challenge under the void-for-vagueness doctrine, a subset of the substantive component of due process that reflects principles of fair notice and reasoned enforcement. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Again, Schneiter has not clearly situated his argument within this framework. But because he asserts that the Department's rules failed to warn him of the possible consequences of his off-duty social-media activity, we treat his argument as one about vagueness.

Even framed this way, however, Schneiter's argument is meritless. True, the work rules the Department cited as the

basis for his termination are generic; they prohibit "[i]ntimidating, interfering with, harassing, demeaning, treating discourteously, or bullying," as well as other "outside activities" that may impair "independence of judgment" or the "ability to perform [one's] duties." But a public employer enjoys significant "latitude in crafting reasonable work regulations for its employees." *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000). It may, for example, "prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion). And we have confirmed that the following rules provide sufficient warning to employees: "conduct [yourself] so as not to bring the Department into disrepute," "treat … superiors with respect," and "conform to and promptly and cheerfully obey all … rules." *Greer*, 212 F.3d at 369. Although these rules were "written in general language," we held that they "sufficiently define[d] a range of inappropriate conduct [that] a reasonable employee would understand." *Id.* So too here. A reasonable employee would understand that the Department's broadly written rules apply to a wide but sufficiently definite range of conduct.

At bottom, Schneiter seems to argue that a public employer must promulgate a specific policy about employee social-media activity before it may discipline an employee for his social-media posts. The Constitution does not require that degree of specificity.

Schneiter also makes a brief, undeveloped argument that the predisciplinary proceedings were influenced by bias against him. While it's certainly true that "[a] fair hearing before a fair and unbiased adjudicator is a basic requirement

of due process," *Alston v. Smith*, 840 F.3d 363, 368 (7th Cir. 2016), the standard for proving bias is not easily satisfied. A challenger "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). This requires "lay[ing] a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016). Schneiter has not met this burden. His wholly speculative and unsupported allegation of bias does not come close to overcoming the presumption of honesty and integrity.

Finally, Schneiter highlights aspects of the disciplinary process that, in his view, failed to comply with state law or the Department's own internal policies. Whatever the merits of these claims, they do not amount to constitutional deficiencies. "[A] failure to follow state statutes or state-mandated procedures does not amount to a federal due process claim of constitutional magnitude." *Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016).

AFFIRMED