In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2394

VASHTI LOVE, DR. CLAUDINE MOORE,
and WILLIE EDWARDS,

Plaintiffs-Appellants,

v.

CITY OF CHICAGO BOARD OF EDUCATION and
MILTON ALBRITTON, individually and as
Principal of the Wadsworth Elementary School,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8786--W. Thomas Rosemond, Jr., Magistrate Judge.

Argued December 5, 2000--Decided February 20, 2001

Before POSNER, EASTERBROOK, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  The three plaintiffs in
this case publicly spoke out against their boss,
Milton Albritton, the principal of Wadsworth
Elementary School, and each was disciplined in
some manner after doing so. The three responded
with this sec. 1983 action alleging that the
discipline they endured constituted impermissible
retaliation for the exercise of their First
Amendment rights. A jury didn't see it that way
as it returned a verdict in favor of Albritton
and his codefendant, the City of Chicago Board of
Education.

Albritton has been the principal of Wadsworth,
located in the Woodlawn neighborhood of Chicago's
south side, since 1988. In that capacity he has
final authority to reprimand the Wadsworth staff
and to raise or lower their performance
evaluations. Albritton also determines each
teacher's assignment within the school, subject
to his or her qualifications and the union
contract, which states that a teacher's
preference should be honored when possible. The
Board of Education, of course, supervises
Albritton's management of Wadsworth. In addition,
the Wadsworth Local School Council--an elected

body made up of parents, teachers, community representatives, and Albritton--has oversight authority over the school's programs, improvements, and finances. The Local School Council has renewed Albritton's contract on three occasions, in 1991, 1995, and 1999.

During the 1994-95 school year, Wadsworth implemented a special education program referred to as "inclusion." The inclusion program was designed to integrate special education students into regular classes to the greatest extent possible. Inclusion, therefore, requires that students with special needs be placed in the "least restrictive environment." In order to achieve this result, social workers and school officials conducted a case study of each special education student. The product of each case study was a document called an Individualized Education Plan, or IEP, which set out the student's goals, along with any necessary accommodations and services to be provided. IEPs also contain highly personal information, such as a social history of the student and his or her family, psychological assessments, academic records, and a catalog of parent and teacher concerns. We turn now to the specific complaints of the three plaintiffs, starting with Vashti Love.

Love, a teacher at Wadsworth since 1991, had some experience in "inclusion," and she claimed she quickly grew dissatisfied with the progress of the program. Specifically, she became concerned that a number of regular education teachers were insufficiently attentive to special education students, and as a result those students did not always receive the services and accommodations outlined in their IEPs. After several complaints to Albritton in 1995 and early 1996 did not resolve Love's perceived problems, she delivered letters to Paul Vallas, the Board's CEO, and Garland Cleggett, the chief education officer in Region 5 of the Chicago Public Schools, accusing Albritton and five staff members of conspiring to sabotage the inclusion program. In addition, Love charged 9 other staff members with aiding and abetting the sabotage and 22 additional staff members with working against the program.

In response to Love's complaints, Beverly Kelley, the special education administrator for Region 5, met with Love on December 4, 1996. Kelley agreed to make unannounced visits to Wadsworth, which she did. Kelley also referred Love to Andrea Kidd, the assistant director of Citywide Special Education Programs, to investigate Love's charges that inclusion funds were being mishandled at Wadsworth. After meeting with Love and examining Wadsworth's financial

records, Kidd found no evidence to support Love's allegations.

On February 5, 1997, Love met with Albritton and several Region 5 staff members, including Cleggett, Kelley, and Kidd, to further voice her concerns about adherence to IEPs. Love brought several student IEPs to the meeting without obtaining Albritton's or the parents' permission to do so. Although all participants in the meeting were authorized to see the IEPs, Kelley informed Love that she had violated the Illinois School Student Records Act, 105 ILCS 10/1 et seq., by removing the IEPs from secure files at the school. After the meeting, Cleggett, Albritton's immediate supervisor, directed Albritton to discipline Love for bringing IEPs to the meeting. The next day, Albritton wrote Love a letter stating that she had violated board policy by bringing IEPs of eight students to the meeting. Albritton also met with Love concerning this incident.

Undeterred, Love filed a complaint with the Department of Monitoring and Implementation concerning what she perceived to be violations of inclusion policies and IEPs. The Board sent an attorney, Jay Kraning, to investigate Love's complaints. In a March 18, 1997, interview, Love told Kraning that Albritton and 35 Wadsworth staff members were sabotaging the inclusion program. Love also made several accusations--some of them inconsistent with later statements--regarding the quality and amount of inclusion training offered to the Wadsworth staff. After interviewing a host of Wadsworth teachers and administrators, Kraning came to a stark conclusion: "Having read all of Mrs. Love's memos containing all of her accusations on imagined injustices against her, as well as meeting with her face to face and hearing her retell all of her complaints and theories dating back to 1994, I question her ability to perceive reality." Love responded to Kraning's investigation by lodging a complaint against him with Lynn St. James, the Board's chief education officer. Love also reiterated her complaints about inclusion and related issues at an open board meeting on June 25, 1997.

Love alleges that Albritton retaliated against her for raising complaints about the implementation of inclusion at Wadsworth. For example, on February 19, 1997, 2 weeks after Love's meeting with the Region 5 staff, Albritton observed the teachers on the third floor of Wadsworth, including Love, as part of the annual evaluation process. Albritton rated Love as having strengths in 13 of the 14 areas he assessed. He marked one area as a weakness,

however: "Complies with the policies, rules & regulations of the school system & of the building." Albritton observed Love's classroom again on May 28, 1997, this time finding strengths in 34 of the 35 areas he examined. He marked as a weakness only her attitude toward cooperation with school personnel. Albritton subsequently lowered Love's overall performance evaluation from "superior" to "excellent" in June 1997./1 Four other teachers had their ratings lowered from "superior" to "excellent" for the 1996-97 school year, but Love was the only one of the five to have complained about the implementation of inclusion.

   Albritton's alleged retaliation against Love continued the following school year. Although Love had been teaching the upper division at Wadsworth for 6 years, Albritton shifted her to a primary-through-intermediate position for the 1997-98 and 1998-99 school years against her wishes. Albritton testified that he shifted Love to fill a vacancy and that he considered her an excellent teacher and the most suitable candidate for the position. Eleven other Wadsworth teachers were rotated from their preferred assignments for the 1997-98 school year. Significantly, the Board never sought to suspend or discharge Love, and she continues to teach at Wadsworth to this day.

   Claudine Moore, our second plaintiff, came to Wadsworth as a math facilitator in 1989, became a fourth-grade teacher in 1992-93, and was transferred to teach preschool in 1993-94. Moore also lodged several complaints about Albritton. For example, in 1992 she advised the Wadsworth Local School Council that Albritton failed to establish a Professional Problems Advisory Council, as required by the School Reform Act. Albritton subsequently set up such a council, but when he failed to renew it in 1993 and 1994, Moore renewed her complaints. In addition, between 1995 and 1998 Moore raised several issues with the Local School Council concerning Albritton's management of the school, including the progress of the implementation of inclusion. Albritton reportedly became furious with Moore over these incidents and on more than one occasion raised his voice at her during the meetings. In February 1995 and February 1997 Moore spoke out against Albritton at open board meetings, complaining about the manner in which Albritton conducted the Local School Council meetings and alleging that Albritton retaliated against her for her previous complaints. She also sent letters to Cleggett and Vallas complaining of retaliation.

   Moore points to several incidents which she says constitute retaliation for her complaints

against Albritton. In March 1993 Albritton notified Moore that her performance evaluation might be lowered because she left students unsupervised in her classroom, she was insubordinate, she failed to perform duties relating to a child's welfare, she was chronically tardy, and she failed effectively to use instructional time. Albritton subsequently lowered her evaluation from "superior" to "excellent" for the 1992-93 school year.

Moore's evaluations continued to decline the following year. On May 6, 1994, Albritton noted 4 strengths and 26 weaknesses in a visit to Moore's classroom. According to Albritton, he continued to have problems with Moore and, in late 1994, was forced to request that the Board terminate her. The Board issued a warning resolution instead, on March 22, 1995, citing, among other things, 70 incidents of tardiness during the 1993-94 school year, insubordination to the principal, and conduct unbecoming a teacher, such as telling parents she would teach their children nothing but the basics and insulting a student by questioning how he made the Honor Roll. Several months later, Albritton, without explanation she says, had police escort her from the school while she was teaching a summer school session.

Albritton's dissatisfaction with Moore continued in 1996. On May 2 he issued a notice of pre-disciplinary hearing charging Moore with numerous offenses, and shortly thereafter recommended that she be terminated. A reviewing officer appointed by the Board found substantiation for the charge of insubordination, and Moore was suspended for 5 days without pay. A short time after her return, on November 19, 1996, Moore became involved in an altercation with the school nurse and, less than one month later, was cited by Velma Cooksey, the head teacher, for disrespectful treatment of Cooksey in front of parents and students.

Albritton issued Moore an unsatisfactory performance evaluation for the 1996-97 school year and for each school year thereafter. Moore filed a grievance after each such evaluation, and each time her evaluation was changed to "no rating" because Albritton failed to give Moore the required notice of his intent to lower her rating. Albritton did not permit Moore to teach summer school in 1997 and suspended her again in February 1998. During the 1997-98 school year, 9 of the 15 students who started in Moore's class were transferred to other classes because of complaints from their parents about Moore.

The final plaintiff, Willie Edwards, began

working as an instructional aide at Wadsworth in August 1996 and, like Love and Moore, his relationship with Albritton turned sour. In November 1996 Edwards attended an inclusion meeting for all staff at which Love got into a heated argument with a school official. Edwards claimed to have observed Albritton smiling as the official yelled at Love and, taking exception to this fact, sent a memo to Albritton expressing his displeasure with the incident. Edwards followed this up with three early 1997 complaints: (1) a complaint to two board members regarding his treatment by Albritton and several regular education teachers, as well as the treatment of special education students by regular education teachers, (2) a complaint to Albritton concerning a lack of respect for the inclusion program, and (3) a complaint to Vallas concerning his treatment by Albritton. Edwards also attended the June 1997 open board meeting in support of Love.

Like the other plaintiffs, Edwards was disciplined by Albritton during the general time periods in which he made complaints. In the fall of 1996 and spring of 1997 Albritton placed three written reprimands in Edwards' mailbox accusing him of tardiness. The problem continued the following school year and, after a number of additional reprimands failed to have any effect, Albritton sent Edwards a notice of pre-disciplinary hearing dated June 9, 1998, charging that he had been tardy 35 times during the 1997-98 school year, for an accumulated total of 7 hours and 38 minutes. Although Edwards disputed the accuracy of many of Albritton's charges and cited his wife's illness as a mitigating factor for any occasion on which he admitted being late, he was given a one-day suspension. Other tardy employees were also suspended.

In addition to the alleged punctuality problem, Albritton noted several other deficiencies in Edwards' performance. In April 1997 the Board received an anonymous complaint accusing Edwards of transporting students without proper authorization and giving candy and money to students. After looking into the matter, the Board's director of investigations determined that the transportation charge was meritorious. Edwards testified that he gave rides to students only at Albritton's request and that he was told all of the charges had been deemed unfounded. Also in April 1997 Albritton reprimanded Edwards for letting students into the building early and in May 1998 reprimanded him for reading a newspaper at an inappropriate time. Edwards denied that he had let students into the building early and contended that he read the newspaper as part of a classroom exercise. As to many of these

incidents, Edwards testified that other members of the Wadsworth staff committed similar infractions but were not disciplined.

Although the plaintiffs' brief lists five issues on this appeal, they really are making only two claims: that the evidence in support of the verdict against them was insufficient and that the trial judge committed reversible error when he permitted the jury to disband for the weekend without consultation with the parties and without giving admonitions to the jurors to refrain from talking about the case while deliberations were suspended. The first issue, given our standard of review--we view the evidence in the light most favorable to the winning party--is a dead-bang loser. See Palmquist v. Selvik, 111 F.3d 1332, 1335 (7th Cir. 1997). The second issue gives us some concern, but far from enough to order a repeat performance of the trial.

Because a verdict must stand unless no rational jury could have found as it did, and because, as we just said, we view the evidence in the light most favorable to the verdict, see Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 630 (7th Cir. 1996), the three plaintiffs here have "a hard row to hoe." Sheehan v. Donlen Corp., 173 F.3d 1039, 1043 (7th Cir. 1999). And they would lose this appeal even if the standard was less difficult for a loser to surmount.

A plaintiff bringing a sec. 1983 claim based on First Amendment grounds must establish (1) that his conduct was constitutionally protected and (2) that his protected conduct was a substantial or motivating factor in the challenged action by the defendant. Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 482 (7th Cir. 1995). Proof that the defendant was "brimming over with unconstitutional wrath" against the plaintiff is insufficient; rather, the plaintiff must demonstrate that the challenged action would not have occurred "but for" his constitutionally protected conduct. Button v. Harden, 814 F.2d 382, 383 (7th Cir. 1987). Moreover, even if the plaintiff clears this hurdle, a defendant can still prevail if he proves, by a preponderance of the evidence, that he would have taken the same action even in the absence of a plaintiff's protected conduct. Johnson, 70 F.3d at 482.

A wealth of evidence supports the jury's conclusion that any actions taken against the three plaintiffs had nothing at all to do with their protected conduct, or at least that such actions would have occurred even in the absence of protected conduct./2 With regard to Love, the jury was certainly entitled to credit Albritton's testimony that Love's performance evaluation for

1997 was lowered from "superior" to "excellent" because she removed student IEP's from the school in violation of state law. The jury's conclusion that this was not a retaliatory action is further supported by the fact that Albritton returned Love's evaluation to "superior" the following school year, even though Love continued to speak out against him. Moreover, Albritton lowered the evaluations of four other Wadsworth teachers from "superior" to "excellent" for the 1996-97 school year, and none of the four had lodged complaints against him.

Love also claims that Albritton's 1997 interim evaluations of her--in which he rated her strong in 13 of 14, and 34 of 35, areas--constitute retaliation. Hogwash. First, it's hard to see how an evaluation that is so lopsided on the side of adequate can be considered a black mark on Love's record. Also, the proximity of these evaluations to Love's improper removal of the IEPs, and the areas in which Albritton rated her as weak ("[c]omplies with the policies, rules & regulations . . ." and cooperation with school personnel), are strong evidence that Albritton merely was responding to Love's misconduct. Finally, the jury's acceptance of Albritton's explanation for his decision to alter Love's assignment for the 1997-98 and 1998-99 school years--that he filled a key vacancy with a strong teacher--was fully justified, especially given that 11 other teachers (out of 42) were rotated away from their preferred assignments at the same time. In short, the defendants produced more than sufficient evidence that any actions taken against Love--even if they were "adverse" job actions, a stretch here--were wholly unrelated to her complaints about inclusion.

The same for Moore. Although she received poor performance evaluations and was disciplined on a number of occasions by Albritton, the evidence shows that the defendants acted with restraint. For example, Albritton became fed up with Moore's tardiness and insubordination as early as the 1992-93 school year, and recommended her termination in 1994, but the Board responded only with a warning resolution. The resolution documented 70 incidents of tardiness during the 1993-94 school year, insubordination to Albritton, and conduct unbecoming a teacher. Insubordination was also cited as the reason for Moore's 1996 suspension. "We have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in protected activity, is justification for [adverse employment action]." Kahn v. United States Sec'y of Labor, 64 F.3d 271, 279 (7th Cir. 1995). The jury apparently believed, based essentially upon its assessment of Albritton's credibility, that Moore was disciplined for insubordinate conduct,

and we find nothing in the cold record to impeach that determination. Certainly the more than 50 percent rate of parents pulling their children out of Moore's classes during the 1994-95 and 1996-97 school years speaks ill of her teaching ability and public relations skills. Accordingly, the jury didn't err in concluding that Moore was disciplined for her performance, not for any protected speech in which she engaged.

Finally, the jury could reasonably have found that defendants did not retaliate against Edwards. Although he was disciplined in 1996 and 1997, the years he lodged complaints against Albritton, nothing in the record contradicts Albritton's assertion that the sanctions were imposed to address Edwards' serial tardiness and various other offenses. Albritton's version of events is supported by the fact that many of his reprimands of Edwards took a written form, including the June 9, 1998, notice of a pre-disciplinary hearing which set out the precise amount of time Edwards had been tardy during the 1997-98 school year (7 hours and 38 minutes). At the very least, this contemporaneous documentation of the charges against Edwards proves that tardiness was not a pretextual justification dreamed up after the filing of this lawsuit. Although these written records do not exclude every possibility of a well-planned plot to retaliate, the jury was entitled to believe Albritton's straightforward assertion that Edwards was disciplined purely for reasons of substandard performance.

For the second issue--whether the judge erred by releasing the jury over the weekend without informing the parties and without repeating an earlier cautionary instruction not to discuss the case--we need a little background.

The trial began on April 25, 2000. Prior to a short break that afternoon, the judge cautioned the jurors not to discuss the case with the attorneys. When the jurors returned from the break, the judge clarified (or at least made an attempt to clarify) his earlier instruction: "[E]veryone feels more comfortable if you didn't say anything to anybody . . . . [Y]ou may just nod, probably better that you not talk to anybody, including, of course, you can't talk amongst yourselves about the case, so I stand corrected, all right?" Neither this statement, nor anything like it, was repeated when the jury was excused for the evening on April 25. No admonitions to the jury of a similar sort were requested or given on either April 26 or 27.

Prior to the beginning of the jury's deliberations on Friday, April 28, the judge gave

a number of instructions, including: "If you recess during deliberations, follow all the instructions that I have given you considering your conduct during the trial; that is, if it goes over to Monday." At 4:40 p.m. that day, the jurors sent a note to the judge asking if they could resume deliberations on Monday morning. After receiving the note, the judge dismissed the jurors without advising the parties of the note and without giving cautionary instructions to the jurors before they departed. Apparently the attorneys were told after the fact on Friday that the jurors were sent home with instructions to return on Monday.

On Monday morning, apparently feeling some heat from the attorneys, the judge explained Friday afternoon's events. Albritton's attorney complained about not knowing of the note, and the judge was asked to poll the jurors to see whether they spoke among themselves or with anyone else about the case over the weekend. The Board's attorney asked that they be polled as to whether they read any materials that painted the Board in a "negative light." (Whether or not there was any "negative" material is a mystery as nothing specific in that regard was called to the judge's attention.) The judge asked if the plaintiffs had a position on the matter, and their attorney responded that he considered it improper to poll the jurors on what they may have read because they had not been instructed earlier to avoid reading newspapers. Plaintiffs' counsel then stated: "With respect to polling the jurors to see if they have spoken among themselves or with someone else, I have no idea what the case law is on that issue but it would not seem to be the diplomatic thing to do at this point in time." The judge decided not to poll the jury, which later returned its verdict in favor of the defendants.

Nobody exactly covered themselves with glory by the way this matter was handled in the district court or on this appeal, as fault can be found with the judge and the attorneys for both sides. But however it all shakes out, nothing occurred that remotely suggests that the drastic step of ordering a retrial of this case should be considered.

First, a note about notes. Deliberating juries often send notes to trial judges. Ordinarily, the content of those notes should be shared with the parties, but a little common sense must be exercised. A note, for instance, saying that jurors prefer to have hamburgers from McDonald's brought in to the jury room over the lunch hour rather than have their deliberations suspended while they are taken to a restaurant hardly needs

to be shared with anybody. But notes that concern important issues must always be shared, and doubts about disclosures should always be resolved by disclosing.

In United States v. Widgery, 778 F.2d 325 (7th Cir. 1985), we found it regrettable that a trial judge had not shared with the parties a note received by the judge from the jury accusing one of the jurors of intoxication, along with another asking what would happen if a verdict could not be reached. Notes of this sort must always be shared with the parties. The note in question here falls closer to the McDonald's luncheon suggestion than to the notes received by the judge in Widgery. But the note itself should never have been necessary. Matters like the length of deliberations on a Friday, and when a deliberating jury will be excused for the weekend, are things that should be resolved ahead of time. Certainly, if the judge had told the attorneys when the case was submitted that he wanted to send the jurors home for the weekend after four in the afternoon if they had not yet reached a verdict, no one would have, or could have, validly objected. It would have all been ironed out and spread on the record, and the issue would not be before us. So in that regard we fault the judge for not addressing this matter earlier and for compounding the problem by sending the jury home for the weekend without telling the lawyers, before the fact, that he had done so. The judge also should have repeated, at that time, a cautionary instruction to not discuss the case outside the jury room over the weekend.

But the issue for us on appeal has no merit because the objection to how things were handled by the trial judge was made by the winners, not the plaintiffs. On Monday morning, before deliberations resumed, the record was opened to state objections, and the plaintiffs sat silent, let alone ask for a mistrial. Under the circumstances, especially when there is absolutely no evidence of prejudice to the plaintiffs' case, their present complaint must fall on deaf ears.

For these reasons, the judgment of the district court is

AFFIRMED.

/1 Love's performance evaluation was later changed to "no rating" because Albritton failed to give her advance notice of his intent to lower her evaluation, as required by the union contract. Albritton returned Love's evaluation to "superior" in June 1998.

/2 The implementation of inclusion at Wadsworth and Albritton's handling of Local School Council meetings were matters of public concern, and therefore Love's and Moore's complaints on those subjects were protected by the First Amendment. See Dishnow v. School Dist. of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996) (school guidance counselor's complaints concerning board's violation of open-meetings law deemed protected speech). Although Edwards' complaints were focused primarily on personnel matters, and therefore would not normally merit First Amendment protection, Khuans v. School Dist. 110, 123 F.3d 1010, 1017 (7th Cir. 1997), we assume for the purposes of this appeal that all plaintiffs engaged in protected speech.