In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-2975

MICHAEL MASSEY and
MICKEY MILLS,

*Plaintiffs-Appellants*,

*v.*

MABLE JOHNSON, Dean of
Vincennes University Aircraft
Technology Center, in her individual
and official capacities, JAMES MESSMER,
Vice President of Vincennes University,
in his individual and official capacities, and
GAZELLA SUMMITT, Human Relations
Director of Vincennes University,
in her individual and official capacities,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 C 679—**Larry J. McKinney**, *Chief Judge*.

———————

ARGUED APRIL 12, 2006—DECIDED AUGUST 10, 2006

———————

Before POSNER, RIPPLE and MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  Michael Massey and Mickey Mills,
while employed at the Vincennes University Aircraft

Technology Center, wrote letters to the Indiana legislature complaining about their superiors. In the aftermath of the letters, both Mr. Massey and Ms. Mills were discharged. They then brought this federal civil rights action, *see* 42 U.S.C. § 1983, against three University administrators, alleging that they were harassed and terminated in retaliation for exercising their First Amendment rights. The defendants moved for and were awarded summary judgment. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

The Aircraft Technology Center (the "ATC"), a branch of Indiana's Vincennes University, opened in the mid-1990s to offer degrees in aviation science, technology and maintenance. Built adjacent to the Indianapolis International Airport, the campus consists of hangar-style classrooms in which students receive hands-on training in airplane repair. The defendants in this action were, at all times relevant to this appeal, ATC and Vincennes University administrators. Mable Johnson served as Dean of the ATC, commencing her tenure in 2000. Working out of an office at the ATC campus, she was in charge of the ATC faculty and operations staff. The other two defendants, Gazella Summitt and James Messmer, are administrators at the Vincennes University main campus, located approximately 100 miles from the ATC in Vincennes, Indiana. Ms. Summitt is the Human Relations Director of Vincennes University; Mr. Messmer is the University's Vice President of Statewide Services.

Until he was terminated, the plaintiff Michael Massey was employed by the ATC as a janitor. He was hired in 2000 by the custodian supervisor Mike Hare, with the approval of Dean Johnson. By most accounts, Mr. Massey was a dependable janitor; he worked the night shift, rarely took sick leave and received positive performance evaluations from his superiors. The other plaintiff in this action, Mickey Mills, worked for the ATC as an evening shift librarian until her termination.

The events of this controversy began in February 2002, when Mr. Massey authored a letter detailing a number of very personal and serious accusations against Dean Johnson. Among the letter's allegations were charges that Dean Johnson had hired her boyfriend and her daughter for positions within the ATC, in violation of the University's anti-nepotism policy. In addition, the letter alleged that Dean Johnson had mistreated a disabled employee and had obtained her graduate degree through academic fraud. The letter also noted that internal grievances to Ms. Summitt, the University's human relations director, had gone ignored. Mr. Massey mailed this letter to the president of Vincennes University and to each member of the Indiana legislature.

Upon learning of the letter, Mr. Messmer and Ms. Summitt investigated Mr. Massey's complaints and concluded that they were unfounded; they reported these findings to the university president. Dean Johnson, understandably upset by Mr. Massey's accusations, instructed Mr. Massey's supervisor to fire him, but the supervisor, Mike Hare, refused. Shortly thereafter, Steve LaRoche, a custodian supervisor at the main campus, became Mr. Massey's official supervisor. Hare, who worked at the ATC full-time, evidently remained Mr. Massey's direct supervisor, but he took frequent telephone instructions from LaRoche concern-

ing day-to-day custodial operations at the ATC. Ultimately, two months after Mr. Massey sent his letter, he was fired. According to LaRoche, who made the decision, he discharged Mr. Massey for attempting to justify a period of sick leave by using what appeared to be falsified doctors' notes. When LaRoche attempted to discuss these notes with Mr. Massey, LaRoche was unable to locate him, and he concluded that Mr. Massey was avoiding him.

After his termination, Mr. Massey remained in contact with Mickey Mills, the other plaintiff in this action. Prompted by her discussions with Mr. Massey, Ms. Mills authored a letter of her own supporting Mr. Massey's previous accusations against Dean Johnson and reporting that, in the aftermath of the Massey letter, university officials conducted a sham investigation to cover up the wrongdoing. She mailed this and similar letters to Indiana legislators and to the Federal Aviation Administration; her last letter was sent on September 22, 2003. Ms. Mills also showed one of her letters to her supervisor, who in turn showed it to Dean Johnson. Once Dean Johnson learned of the letter, Ms. Mills allegedly was ostracized by her fellow employees and began to receive an unprecedented stream of reprimands, assignment changes and negative evaluations. In August 2003, her full-time evening shift position was cut to part-time when the ATC's library changed its closing time from midnight to 9 p.m. Finally, in November 2003, and approximately two months after the date of her last letter, Ms. Mills was terminated. As its reason for discharging her, the ATC cited reduced enrollment and elimination of the school's evening program. Notably, Dean Johnson, the accused wrongdoer in the plaintiffs' letters, also had her position eliminated as a result of these factors.

**B. District Court Proceedings**

On April 16, 2004, Mr. Massey and Ms. Mills joined in filing a one-count complaint under 42 U.S.C. § 1983, alleging that they were harassed and terminated in retaliation for exercising their First Amendment right to free speech. After almost one year of discovery, Dean Johnson, Mr. Messmer and Ms. Summitt moved for summary judgment. In deciding the defendants' motion, the district court first addressed the allegations related to Mr. Massey's termination. At the outset, the court noted that the decision to fire Mr. Massey was made directly by Steve LaRoche, a supervisor operating within a chain of command that did not include Dean Johnson. Therefore, in the court's view, even if there were direct evidence of retaliatory animus on the part of Dean Johnson, this evidence could not be attributed to LaRoche, the true decision maker involved in Mr. Massey's termination. As for circumstantial proof, the court concluded that Mr. Massey had not presented anything other than his subjective belief that LaRoche's reason for firing him—the fake doctor's notes—was pretext. According to the court, the undisputed evidence showed that the notes were indeed suspicious and that Mr. Massey never had made himself available to provide LaRoche with an explanation. This, in the court's view, was a valid reason for firing Mr. Massey, and one that had not been rebutted as false.

Similarly, the court determined that Ms. Mills' evidence did not suggest directly that the individuals involved in her termination were motivated by retaliation. Most notably, the court discounted evidence of a meeting in which the defendant, Mr. Messmer, became visibly angry at Ms. Mills for writing her letters. According to the court, proof that Mr. Messmer was angered by Ms. Mills' protected speech was insufficient to prove retaliation; " 'rather, the plaintiff must

demonstrate that the challenged action would not have occurred but for his constitutionally protected conduct.'" R.66 at 13 (quoting *Love v. City of Chicago Bd. Educ.*, 241 F.3d 564, 569 (7th Cir. 2001)). Alternatively, the court held that, even if retaliation was a partially motivating factor, the defendants had offered a legitimate and persuasive justification for firing Ms. Mills—reduced enrollment and budget cuts—that Ms. Mills had not rebutted as pretext.

## II

## DISCUSSION

We review the district court's summary judgment ruling de novo, resolving facts, and inferences reasonably drawn from those facts, in the light most favorable to the non-moving party. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," Rule 56(c) mandates entry of summary judgment against that party because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

Government retaliation tends to chill an individual's exercise of his First Amendment rights, and this principle applies with equal force in the context of public-sector employment. *See Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001) ("[A] public employee

does not shed his First Amendment rights at the steps of the government building."). Public employers, as a general rule, may not respond to their employees' protected activity with actions aimed to deter that activity. *See Garcetti v. Ceballos*, 126 S. Ct. 1951, 1957 (2006); *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674-75 (1996); *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004). To make out a prima facie case of first amendment retaliation, a public employee must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action. *See Spiegla v. Hull*, 371 F.3d 928, 935, 940-41 (7th Cir. 2004) (citing *Mt. Healthy City Sch. Dist. Bd. Educ. v. Doyle*, 429 U.S. 274 (1977)).

With respect to the plaintiffs' discharges, the first two elements of their retaliation claims are undisputed; the letters written by Mr. Massey and Ms. Mills consist of speech protected by the First Amendment[1] and, because both plaintiffs were terminated, it is undisputed that each suffered a deprivation likely to deter the exercise of free expression. The controversy in this case surrounds the third element—whether, and to what degree, the plaintiffs' letters motivated the defendants' decisions to fire them.

As articulated by our case law, this element amounts to a causation inquiry. *See, e.g., Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669-70 (7th Cir. 2005).

---

[1] That is to say, the defendants have conceded that the speech touched on matters of public concern, and they do not argue that any University interest outweighs the plaintiffs' interest in speaking. *See Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 568 (1968); *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

To establish a causal link between the protected expression and a subsequent action by the employer, the plaintiff must show that the protected conduct was a substantial or motivating factor in the employer's decision. *See Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287. As we recently clarified, "[a] motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla*, 371 F.3d at 942. Moreover, as in other contexts where motivation is at issue, the plaintiffs are not required to come forward with direct evidence or "the so-called smoking gun." *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003). Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive. *See Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005).

If the plaintiffs make this threshold showing, the burden then shifts to the defendants to produce evidence that they would have fired the plaintiffs even in absence of their letter-writing. *See Spiegla*, 371 F.3d at 943. In other words, the defendants may show that retaliation was *not* the but-for cause for the firing.[2] Finally, assuming the defen

---

[2] The district court appears incorrectly to have thought that but-for causation was an element of the plaintiffs' affirmative burden of production. As support for this proposition, the court relied on *Love v. City of Chicago Board of Education*, 241 F.3d 564, 569 (7th Cir. 2001), in which we said, "[the] plaintiff must demonstrate that the challenged action would not have occurred but for his constitutionally protected conduct." In *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004), however, we expressly disavowed this language and held instead that the burden rests on the defendant to show lack of but-for causation once the plaintiff has shown

(continued...)

dants carry that burden, the plaintiffs then must persuade a fact-finder that the defendants' proffered reasons were pretextual and that retaliatory animus was the real reason that the defendants fired them.

As the Supreme Court recently clarified, a plaintiff's prima facie case, supplemented by evidence of pretext, often is adequate to sustain a finding of liability for unlawful retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). In the summary judgment context, this means that, to rebut the defendants' proffered explanations for their terminations, Mr. Massey and Ms. Mills must produce evidence upon which a rational finder of fact could infer that these explanations were lies. *See Vukadinovich v. Bd. Sch. Trs. N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).

**A.**

We shall begin, as the district court did, with Mr. Massey's claim of unlawful retaliation. Mr. Massey relies on what he views as direct evidence of a causal link between his letter-writing and subsequent termination. Direct evidence, in cases where a defendant's motivation is at issue, is rarely present because it "essentially requires an admission by the decision maker that his actions were based on the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (internal quotation marks omitted). Nevertheless, Mr. Massey asserts that Dean Johnson made such an admission after learning that she was the subject of Mr. Massey's letter. Indeed,

---

[2] (...continued)
that retaliation was at least a motivating factor.

according to the deposition of Mr. Massey's supervisor, Dean Johnson gave an instruction to fire Mr. Massey shortly after she learned of the letter. However, the supervisor, Mike Hare, refused to execute the instruction. The eventual decision to fire Mr. Massey was made instead by LaRoche, a superior of both Hare and Mr. Massey, who in turn reported to the Director of Physical Plant and to the University Vice President. Importantly, Dean Johnson was outside of this chain of command and therefore had no authority to influence directly LaRoche's decision. Nor, despite ample discovery, has Mr. Massey presented evidence that Dean Johnson influenced LaRoche's decision indirectly; LaRoche's deposition testimony was that the decision was his alone. To constitute direct evidence of improper animus, a statement must relate to the motivation of the decision maker responsible for the contested decision, or to the motivation of those who provide input in the decision. *See Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005). As far as this record indicates, Dean Johnson was neither.

In the alternative, Mr. Massey submits that we ought to impute Dean Johnson's retaliatory motive to the two other defendants in this action, who, unlike Dean Johnson, in fact possessed the authority to discharge Mr. Massey. He frames his argument as an evidentiary one, based on the exception to the hearsay definition for the admissions of a party-opponent, *see* Fed. R. Evid. 804(d)(2)(D). According to Mr. Massey, the statements of Dean Johnson are admissible against Mr. Messmer and Ms. Summitt as the admissions of an agent, speaking within the scope of her employment. This argument misses the mark. As an initial matter, we do not believe that Dean Johnson's statements ought to be characterized as hearsay. Quite obviously, the truth of Dean Johnson's statement—that Hare should fire Mr. Massey—is irrelevant; what matters is that Dean Johnson gave the

instruction. Because the statement is not being offered for its truth, it is not hearsay and needs no exception to be admissible.

Yet, Dean Johnson's admission still cannot be considered direct evidence of retaliation. Looking beyond the evidentiary point, Mr. Massey's true contention seems to be that Dean Johnson's statement is evidence of a retaliatory attitude existing generally among university officials in the wake of his letter-writing. Put simply, he seems to be saying, "Dean Johnson wanted me fired, and therefore so did her superiors." We cannot accept this argument either. Little in the record suggests that the other two defendants, Ms. Summitt and Mr. Messmer, were angered by Mr. Massey's letter, especially to the point of wanting him discharged. Moreover, even if these other defendants did want Mr. Massey terminated, LaRoche presented unrefuted deposition testimony that he alone made the decision to fire Mr. Massey. *See* R.49, Ex.7 at 157-58. Mr. Massey has not satisfied even his initial burden of producing evidence that links his termination to his protected speech.

Even assuming, arguendo, that Mr. Massey had satisfied this threshold burden, no rational juror could find that LaRoche's reason for firing him was false. The record indicates that, before his termination, Mr. Massey accounted for several days of sick leave by submitting two "doctors' notes," written on prescription pads, advising that Mr. Massey should stay home from work. LaRoche reviewed these notes and checked them against records at the care facilities from which they were ostensibly issued. These care facilities told LaRoche that the signature appearing on the notes did not belong to any of their treating physicians, that notes such as these are not written on prescription pads, and that, in any event, the particular notes submitted by Mr.

Massey were on outdated prescription forms that the facilities no longer used. On this information, LaRoche suspected that the notes had been falsified and attempted to discuss the matter with Mr. Massey. Mr. Massey, however, did not make himself available, sending only an email that stated: "The doctor's slip was as good as gold." R.49, Ex.8 at 187. In his appeal to this court, Mr. Massey offers a variety of explanations to excuse the suspicious doctors' notes. Critically, however, he makes no claim that LaRoche ever was made aware of these explanations. Mr. Massey's post hoc explanations for his conduct therefore do nothing to undermine the sincerity of LaRoche's reasons for firing him. Summary judgment with respect to Mr. Massey's claim was appropriate.

**B.**

The direct evidence presented by Ms. Mills fares slightly better in linking her termination to an improper motive. At her deposition, she described a meeting with Mr. Messmer, the University vice president, in which he had become visibly angry at Ms. Mills for her accusatory letters. Mr. Messmer's anger was understandable given that, unlike the Massey letter, Ms. Mills' letter had targeted Mr. Messmer himself, along with Dean Johnson and the human relations director, Ms. Summitt. This evidence of Mr. Messmer's understandable displeasure at being the subject of Ms. Mills' protected speech at least raises the inference that retaliation may have been a motivating factor in her eventual termination. Ms. Mills then had shifted the burden to the defendants to offer undisputed evidence that she would have been fired even if she had not written the letters.

As a means of satisfying this burden, the defendants offered a legitimate, non-retaliatory reason for firing Ms. Mills: the University terminated her position, along with the positions of numerous other employees, because economic considerations demanded that the ATC's staff be downsized. By way of background, the ATC opened originally as a part of an incentive package put together by the State of Indiana to attract United Airlines to the Indianapolis Airport; it was anticipated that United Airlines would hire ATC graduates as airplane mechanics. However, due to its financial difficulties, United Airlines never met these expectations. As a result, average student enrollment at the ATC declined by more than one half between Fall 2001 and Fall 2003 when Ms. Mills was terminated. Over the same period and continuing until early 2005, the number of full-time employees at ATC was cut by a similar percentage. In addition, the ATC faced a budget deficit of over $500,000 for the fiscal year in which Ms. Mills was discharged.

Although the persuasiveness of an employer's non-retaliatory explanation ordinarily is "for the finder of fact to assess," summary judgment should be granted when, in light of the defendant's unrebutted evidence, "the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Here, Ms. Mills simply has not come forward with evidence that the defendants were lying when they cited economic constraints and downsizing as the reasons for her termination. In an attempt to show pretext, she invites our attention to a negative performance evaluation that was drafted by Dean Johnson for Ms. Mills shortly before she was terminated. An unfairly drafted performance evaluation, such as this, certainly could strengthen the inference of improper motive. However, in this case, the

draft evaluation was handled appropriately by university officials. The record shows that Dean Johnson first submitted the draft evaluation to Ms. Summitt for her approval. Ms. Summitt then declined to issue the evaluation as written because, in her view, Dean Johnson's criticisms were unfounded. This sequence, although cited by Ms. Mills as evidence of pretext, actually gives more legitimacy to the University's stated reasons for terminating Ms. Mills. Instead of being out to get her for writing the letters, the actual decision makers, Ms. Summitt and Mr. Messmer, seemed unaffected by bias in their handling of Ms. Mills' performance evaluation.

At bottom, the evidence of an unfairly drafted evaluation is simply a reflection of the overall theme that emerges from the factual material in this case—a theme of prolonged bad blood between Dean Johnson and the plaintiffs, originating in the plaintiffs' workplace difficulties with Dean Johnson's daughter. Mr. Massey's original letter, accusing Dean Johnson of nepotism, charged that Dean Johnson had hired her daughter in a position at the ATC for which the two plaintiffs did not believe she was qualified. Enduring workplace tension ensued, and, as a consequence, Dean Johnson may have been out to get the plaintiffs for their letter-writing. However, that fact alone cannot sustain Ms. Mills' retaliation charge. The fatal flaw of her case is that Dean Johnson did not have authority over her employment and did not influence the individuals who did. Ultimately, although Ms. Mills' retaliatory termination claim goes slightly further than Mr. Massey's, she still has not presented evidence on which a rational juror could question the sincerity of the individuals who actually made the decision to terminate her.

**C.**

Finally, Ms. Mills contends that, before being termi-nated, she was harassed by the defendants in retaliation for her letter-writing campaign. In the first amendment context, harassment, just as much as a formal discharge, may be actionable if it is designed to deter a public em-ployee's free speech. *See Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Additionally, to give rise to liability, the retaliatory harassment need not be extreme. Although isolated criticisms may not suffice, *see Mosely v. Bd. Educ. of City of Chicago,* 434 F.3d 527, 534 (7th Cir. 2006), we have emphasized that harassment of a public employee vio-lates the First Amendment "unless the harassment is so trivial that a person of ordinary firmness would not be deterred from . . . expressing those beliefs." *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989). For example, in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), we held that a "campaign of petty harassments" that included repri-mands and ridicule could be enough to deter the exercise of free speech.[3] *See also DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) (noting that "a campaign of petty

---

[3] In *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), a city employee took a temporary leave of absence to run for mayor. When she returned to the job, she was subjected to a series of petty harass-ments as a result of this political activity. In one representative instance, she was held "up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common and was especially favored." *Id*. at 625. Reversing the district court's 12(b)(6) dismissal, we held that a campaign of harassment "though trivial in detail may have been substantial in gross," and the question of whether in that case it was enough to deter the exercise of free speech remained an issue of fact for the jury to decide. *Id.*

harassment" that includes "minor forms of retaliation" and "false accusations" may be actionable under the First Amendment).

The district court acknowledged this relatively low threshold for actionable harassment but nevertheless determined that Ms. Mills' accusations of harassment were so trivial that no rational jury could find that they would deter free expression. We believe that the district court accurately assessed the situation. Ms. Mills claims that, after her letter-writing began, she was told that she could no longer bring water into the computer area of the library. Ms. Mills does not link this accusation to any particular defendant and provides no record support for the assertion that she was singled out by the no-beverage rule. Ms. Mills also alleges that her supervisor assigned her additional tasks, told her to increase her productivity and, on one occasion, reprimanded her for failing to order certain supplies. Yet, these instances of "harassment," even if sufficient to deter free expression, were at the hands of Ms. Mills' immediate supervisor, who was not criticized in her letters and had no reason to retaliate against her. On this record, we believe that no rational jury could find that this sequence of events amounted to a campaign of retaliation designed to deter Ms. Mills' free speech.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*