In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-1013

TIMOTHY KINGMAN,

*Plaintiff-Appellant,*

*v.*

CHRIS FREDERICKSON, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 19-cv-999 — **William M. Conley**, *Judge.*

———————————

ARGUED MAY 26, 2022 — DECIDED JULY 11, 2022

———————————

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* In March 2019 Timothy Kingman, the Director of Public Works for the City of Rhinelander, Wisconsin, took to the floor of a City Council meeting with a declaration of no confidence in a colleague. The City investigated Kingman's contentions and found them without merit. In the process, however, third-party investigators discovered that Kingman himself had not only mistreated his employees, but also had gone so far as to retaliate against those who had

complained about the toxic work environment he created in his department. The City fired Kingman, only to find itself on the receiving end of a lawsuit. Kingman alleged that the termination reflected payback for exercising his First Amendment rights at the City Council meeting. The district court entered summary judgment for the City and other individual defendants, concluding that no reasonable jury could find that the Council's vote to fire Kingman reflected unlawful retaliation. We agree and affirm.

# I

## A

Timothy Kingman served as the City of Rhinelander's Director of the Department of Public Works from 2011 until June 2019. Over time he developed a reputation as a difficult supervisor who was often rude and demeaning to others. Several employees in the department even quit to avoid working with him. The City knew all of this and at one point put Kingman on a performance improvement plan, but he remained at the helm of Public Works.

Things took a turn for the worse in the early spring of 2019. By then the City had hired Daniel Guild to serve as its City Administrator. A handful of incidents in the first six months of Guild's tenure led Kingman to believe that his new colleague was both incompetent and corrupt. Kingman took his concerns directly to Guild and Mayor Chris Frederickson to no avail.

On March 11, 2019, Kingman stood up during the public comment segment of a City Council meeting and lodged a litany of complaints against Guild. Some were petty grievances about Guild's changes to City practices or took issue with

Guild's managerial style. Kingman complained, for example, that Guild unnecessarily changed the office stationery and preferred text messages over in-person communications. Other contentions were more serious, such as Kingman's allegation that Guild had deviated from the City's "long-standing financial practices" and engaged in "political hit jobs" against other Rhinelander public officials. Kingman memorialized his public remarks by submitting a "Declaration of No Confidence" in Guild for the City Council's consideration.

The City reacted by retaining two outside investigators to evaluate Kingman's allegations. Tensions within Rhinelander's government escalated while the investigation progressed. In early April 2019, for instance, a group of fifteen employees—including some of Kingman's subordinates in the Department of Public Works—submitted a competing "Declaration of Full Confidence" in Daniel Guild. And at the City Council's April 22 meeting, eight current and former Public Works employees implored the Council to address the hostile work environment within their department and submitted written complaints to the same effect. None of the employees mentioned Kingman by name, but it was clear that he was the chief source of their discontent.

Kingman did not take well to public criticism from his own subordinates. In an initial email after the April 22 meeting, he informed Mayor Frederickson and the City Council president that he intended to issue verbal warnings to each employee who voiced such concerns outside of the formal internal grievance process. Kingman also shared his view that the employees' complaints were evidence of ongoing retaliation against him for speaking out against Guild at the March City Council meeting.

In a follow-up email a few days later, Kingman went further and suggested that Guild stirred others to complain. He also reiterated that he did not think the employees' chosen course of action was acceptable and asked City leadership whether he should proceed with the proposed discipline. Even more, Kingman worked behind the scenes to pressure Public Works supervisors to discipline—or even terminate—the complaining employees.

The third-party investigators published three reports at the end of May 2019: the first evaluated Kingman's allegations in the declaration of no confidence against Guild; the second assessed Kingman's contention that he was harassed and retaliated against for that declaration; and the third addressed the Public Works employees' complaints about the hostile work environment within their department.

The third report proved most problematic for Kingman. It confirmed that each of the Public Works employees who spoke at the April 22 City Council meeting was complaining about Kingman, and that their complaints reflected a wider disagreement with Kingman's managerial style and tendencies towards micromanagement, threatening and yelling at employees, and using foul language in the workplace. The report further found that Kingman demanded—"not just in an isolated burst of poor judgment, but consistently over a three-day period"—that Public Works supervisors discipline or fire the employees involved in making the public complaints. In light of these findings, the investigators recommended that Kingman be placed on immediate administrative leave pending further consideration by the City Council. Mayor Frederickson accepted the recommendation and placed Kingman on leave on June 3.

The investigators presented their findings to the City Council in closed session in early June and, at its June 24 meeting a few weeks later, the City Council afforded Kingman a chance to respond. The City Council then put Kingman's continued employment to a vote. It split four to four, with Mayor Frederickson casting the tiebreaking fifth vote in favor of Kingman's termination.

Mayor Frederickson informed Kingman of the City Council's decision in a letter dated June 25, 2019. Though brief, the letter highlighted Kingman's attempt to "improperly discipline and/or terminate employees of [his] department for providing public comment at an April Council meeting" and explained that a majority of the councilmembers "did not find [Kingman's] explanation at the private conference" denying the allegations against him "to be convincing or consistent."

B

Several months later, Kingman invoked 42 U.S.C. § 1983 and filed this First Amendment and age-based retaliation lawsuit against the City of Rhinelander, Mayor Chris Frederickson, the councilmembers who voted in favor of his termination, and City Administrator Daniel Guild.

Discovery ensued and in time the defendants moved for summary judgment on Kingman's claims. In the district court's assessment, Kingman had not done enough to survive summary judgment on his First Amendment retaliation claim. Based on the evidence in the record, the court concluded that because Kingman spoke as a City employee on an issue of only personal interest rather than a broader matter of public concern, his speech received no protection under the First Amendment. The district court further determined that,

even if his speech was protected, Kingman failed to rebut the defendants' evidence that the City Council fired him because of his attempt to retaliate against Public Works employees, not his critical speech at the March 2019 meeting.

The district court's analysis of Kingman's age discrimination claim also turned on causation. Nothing in the record suggested that the City Council fired Kingman because of his age, and to the extent that his claim focused on perceived retaliation for filing a complaint with the EEOC, he presented no evidence of a causal link between the City Council's knowledge of the complaint and its decision to terminate him.

Kingman now appeals, urging us to reverse the district court's resolution of his First Amendment retaliation claim.

## II

### A

Kingman asks us to take our own independent look at the summary judgment record and contends that, based on the evidence before it, the district court was wrong to conclude that his complaints about Guild were both constitutionally unprotected and unrelated to his firing. In pressing this position, Kingman spills substantial ink recounting the events that played out within Rhinelander's city government from the fall of 2018 through his termination in June 2019 and beyond. He likewise devotes considerable space to outlining the relevant First Amendment legal framework governing public employees and emphasizing the difficult line drawing between protected and unprotected speech that often presents itself in this area of law.

But all along Kingman stops short of grappling with a reality in the summary judgment record that was before the

district court and is before us now on appeal: the lack of evidence that would allow a jury to conclude that the City terminated him for any reason other than his own workplace misconduct.

B

All agree that government employees do not sign away their free speech rights when answering the call to public service. To the contrary, the First Amendment tolerates "only those speech restrictions that are necessary for [government] employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). The "threshold inquiry" in this area, the Supreme Court has emphasized, focuses on "the nature of the speech at issue." *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, slip op. at 15 (U.S. June 27, 2022). If a public employee speaks pursuant to his "official duties," the First Amendment "generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Id.* (citing *Garcetti*, 547 U.S. at 421).

On the other hand, if the government employee speaks as a private citizen on a matter of public concern, the Free Speech inquiry is more complex and requires courts to go the added step of "engag[ing] in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Id.* (quoting *Garcetti*, 547 U.S. at 423). The Supreme Court has articulated the requisite balancing in *Connick v. Myers*, 461 U.S. 138, 147 (1983), and *Pickering v. Board of Education*, 391 U.S. 563 (1968).

These principles govern courts' analysis of the initial element of a First Amendment retaliation claim: whether a

public employee engaged in constitutionally protected speech. See *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019). To make out the rest of a prima facie case, the plaintiff must also present evidence that he suffered a "deprivation likely to deter free speech" and that his employer's decision to take an adverse action against him was motivated, at least in part, by that constitutionally protected speech. *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008).

"As articulated by our case law," this latter element "amounts to a causation inquiry" requiring the plaintiff to "show that [his] protected conduct was a substantial or motivating factor in the employer's decision." *Massey v. Johnson*, 457 F.3d 711, 716–17 (7th Cir. 2006); *Harnishfeger*, 943 F.3d at 1113–14. A plaintiff may rely on either direct, "so-called smoking gun" evidence, or more circumstantial proof, "such as the timing of events or the disparate treatment of similar individuals" to do so. *Massey*, 457 F.3d at 717.

If the plaintiff makes the threshold causation showing, the burden shifts to the government employer to produce evidence that it would have fired the plaintiff even in the absence of the protected speech. *Id.* (citations omitted) ("In other words, the defendants may show that retaliation was *not* the but-for cause for the firing."); *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 313–14 (7th Cir. 2017) (explaining that if the plaintiff makes an initial showing of retaliatory motive, the burden shifts to the defendants "to provide a legitimate and nonretaliatory explanation for the firing"). If the employer carries that burden, a plaintiff must persuade the factfinder that the defendant's proffered reasons were pretextual. See *id.* at 314.

C

Determining whether the Free Speech Clause protected Kingman's complaints about Daniel Guild at the March 2019 City Council meeting is not an easy task. The proper analysis, we have explained, depends on the "content, form, and context of the contested statement, as revealed by the whole record." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004) (cleaned up). The context before us here is not a large urban area like Chicago or an expansive department or agency like the Department of Defense, but instead a small town in the middle of America—the City of Rhinelander, Wisconsin. This matters for measuring the relevant inquiries.

Even in the context of a small, rural town like Rhinelander, the district court thought Kingman's speech fell outside the First Amendment. In its view, Kingman's declaration of no confidence, by its terms, reflected a complaint by one employee against another up the supervisory chain of command—a fact suggesting that Kingman was complaining in his capacity as a City employee, not as a private citizen. Even more, the district court continued, Kingman's grievances focused primarily on Guild's management style, availability to other City employees, and administrative choices—concerns that may have impacted Kingman's experience as an employee, but which were not of import to the public at large. The district court's perspective is plenty reasonable.

But other facts may point in a different direction. Recall that Kingman's declaration of no confidence and accompanying remarks made the point, albeit without elaboration, that Guild had deviated from the City's long-standing financial practices and had engaged in political hit jobs against other elected and career public officials. Kingman presented

evidence that these issues had been the subject of local news coverage, suggesting a broader public interest in that information. See *Spiegla*, 371 F.3d at 936 ("While not dispositive of whether speech relates to a matter of public concern, the fact that the press takes interest in the matter is relevant to the determination."). He also chose to air his concerns in the public session of the City Council's meeting, rather than privately with individual councilmembers or in a closed session—a fact suggesting he intended to speak as a private citizen on a matter of concern to his fellow Rhinelander residents. It is not difficult to see aspects of Kingman's speech as potentially worthy of First Amendment protection.

Our only point here is to observe that the summary judgment record contains evidence cutting in both directions on the threshold question of the nature of Kingman's speech. In the end, we do not need to resolve the question, for the summary judgment record is clear that, no matter whether the First Amendment protected Kingman's speech, it was not his complaining about Daniel Guild that cost him his job. See *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019). The unavoidable conclusion from the evidence before the district court is that the City Council voted to fire Kingman because of his own workplace misconduct.

D

Remember Kingman's burden. Even if the First Amendment protected his complaints, to survive summary judgment he had to come forward with some evidence that his speech was "at least a motivating factor in the [City's] decision to take the retaliatory action" of firing him. *McGreal*, 850 F.3d at 312 (citation omitted).

A plaintiff may create a triable causation issue by demonstrating that an adverse employment action followed "close on the heels" of his protected speech. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). When a plaintiff relies solely on a suspicious timing argument, however, "the time period between the protected activity and the adverse action must be very close"—typically a period of days, not weeks or months. *Id.* (cleaned up).

Here, three months separate Kingman's public criticism of Guild and his termination. In Kingman's view, an escalating pattern of snubs, hostility, and maneuvering to push him out the door bridges that temporal gap and demonstrates that his June 2019 firing was still causally related to his March 2019 speech. This argument is akin to the one we found unconvincing in *Kidwell*. 679 F.3d at 966–69 (concluding that five post-speech incidents leading up to his termination did "not give rise to an inference that [the plaintiff's] speech was a motivating factor in any of the employment actions taken against him").

But even accepting, as the district court did, that the timing of Kingman's firing was suspicious, the causation analysis must go further. Kingman's initial showing that his speech was a motivating factor for his termination does not, without more, warrant his claim proceeding to trial. Instead, it places the onus on the defendants to offer evidence that Kingman would have been terminated even absent his speech.

The defendants explain they have done just that. Recall that the independent investigators' third report concluded that Kingman intended to retaliate against those Public Works employees who publicly complained about the toxic work environment that he created through his abusive

managerial style. City councilmembers testified during depositions that they found the report credible and Mayor Frederickson's termination letter informed Kingman that a majority of the City Council concluded that his justifications for his behavior lacked credibility. Nothing in the summary judgment record indicates that Kingman's complaints about Guild were a part of the conversation.

This evidence severs any causal connection between Kingman's speech and his termination. Kingman's attempt to discipline or terminate his subordinates for their public comments is just the type of "significant intervening event" and seriously "inappropriate workplace behavior" that we have said may separate an employee's protected activity "from the adverse employment action he receives." *Kidwell*, 679 F.3d at 967 (citations omitted). Here, as in *Kidwell*, the evidence supported the City's contention that Kingman's "own aberrant actions or other intervening circumstances"—not his public comments several months prior—are what "led to the negative responses that he incurred." *Id.* In short, Kingman's own misconduct between March and May 2019 constituted a legitimate, non-retaliatory reason for his dismissal.

If Kingman identified some evidence showing that the explanation for his termination was pretextual, "the persuasiveness of [the] employer's non-retaliatory explanation" would be for a factfinder to assess. *Massey*, 457 F.3d at 719; *Sweet v. Town of Bargersville*, 18 F.4th 273, 278 (7th Cir. 2021). But he points to nothing in the record that a jury could reasonably rely on to conclude that the City Council's justifications are pretextual, so "the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Massey*, 457 F.3d at 719 (citation

omitted). Kingman's unsupported speculation that Mayor Frederickson and Guild rigged the investigation against him does not cut it. Nor is it enough for Kingman to observe that he never followed through with any of his threats to discipline any Public Works employee for a public complaint. Neither point constitutes evidence which could lead "a rational juror [to] question the sincerity of the individuals who actually made the decision to terminate [him]." *Id.* at 720.

One final note on another gap in Kingman's causation theory. The unifying theme of the summary judgment evidence and briefing in this case is the interpersonal conflict between Timothy Kingman and Daniel Guild. Their feud began almost immediately after Guild became City Administrator in the fall of 2018 and continued, perhaps with increasing intensity, through Kingman's public declaration of no confidence and the several months of fallout that followed in early 2019. It may be that Guild was "out to get" Kingman or, at the very least, was unwilling or unable to work productively with him after Kingman's public criticism. *Id.* As in *Massey*, however, the "fatal flaw" in Kingman's heavy reliance on Guild's potential retaliatory motive is that Guild "did not have authority over [Kingman's] employment," and none of the evidence in the record would permit a jury to reasonably infer that Guild took any tangible steps to "influence the individuals who did." *Id.*

For these reasons, we AFFIRM.